LOKEN, Circuit Judge.
Brothers Desmond and Jesse Rouse, and their cousins, Garfield Feather and Russell Hubbeling, appeal convictions for sexual abuse of young children on the Yankton Sioux Indian Reservation, raising numerous issues. A divided panel reversed and remanded for a new trial on grounds that the district court erred in excluding certain expert opinion testimony and in denying defendants’ motion for independent pretrial psychological examinations of the abused children. See United States v. Rouse, 100 F.3d 560 (8th Cir.1996). After the court granted the government’s suggestion for rehearing en banc and vacated the panel opinions, the panel granted the government’s petition for rehearing, and the court denied rehearing en banc as moot. Having further considered the parties’ contentions on appeal, we now affirm.
I. Background.
The victims are granddaughters of Rosemary Rouse. During the summer and fall of 1993, defendants lived at Rosemary’s home on the Yankton Sioux Reservation. The victims also lived or spent a great deal of time at this home. In October 1993, five-year-old R.R. was placed with Donna Jordan, an experienced foster parent, due to neglect and malnutrition. R.R. disclosed apparent sexual abuse to Jordan, who reported to the Tribe’s Department of Social Services (“DSS”) (as Jordan was required to do) that R.R. said she had been sexually abused. On January 10, 1994, DSS told Jordan to take R.R. to therapist Ellen Kelson. After an initial interview, Kelson reported to DSS (as Kelson was required to do) that R.R. had reported acts of sexual abuse against herself and other children in the Rouse home. On January 11, DSS removed thirteen children living in the Rouse home and placed them in Jordan’s foster home. Of the four who disclosed sexual abuse by their uncles, T.R. was seven years old, L.R. was six, R.R. was five, and J.R. was four and one-half. The fifth victim of the alleged offenses, F. R., was a twenty-month-old infant.
Four days later, pediatrician Richard Kap-lan examined the children. Dr. Kaplan reported to DSS his medical findings and what the children had said about sexual abuse. J.R. told Dr. Kaplan, “Uncle Jess hurt me,” pointing to her left labia; Dr. Kaplan found a recent bruise or contusion consistent with that kind of abuse. L.R. had “a fairly acute injury” on the right side of her labia majora which “really hurt her.” R.R. told Dr. Kap-lan, “I have a bruise where my uncle put his private spot,” and Dr. Kaplan found a sagging vagina and a scar on her anus. Dr. Kaplan found that T.R. had “obvious trauma and contusion ... and very, very much tenderness” on her labia majora; T.R. told him, “Uncle Jess hurt me there.” On January 19 and 21,1994, FBI Special Agent William Van Roe and BIA Criminal Investigator Daniel Hudspeth interviewed J. R., T. R., R. R., and L.R. The children again reported sexual abuse by their uncles. The children were also seen by a psychiatrist, who referred them to Kelson for therapy. Kelson first saw the children in a group on January 22.
On February 11, Dr. Robert Ferrell conducted a colposcopic examination of the five victims. Dr. Ferrell found “very significant” damage to R. R.’s hymenal ring and tearing in her anal area consistent with anal intercourse. He noted a “whole constellation of findings” indicating L.R. had been abused— damage to her hymenal area, furrowing on either side of her vagina, chronic irritation or trauma, and “clue cells” that are “known to be sexually transmitted.” To Dr. Ferrell, a scar on J. R.’s hymen where a tear had healed was an “important finding,” while T. R.’s “hymenal ring was essentially gone,” the entire area was irritated, and she had furrows in her vagina. Infant F.R. had “tearing and scarring of the anal mucosa.”
Defendants’ medical expert, Dr. Fay, admitted that the reported hymenal scarring on L. R., R. R., and J.R. “certainly ... leads you to think about sexual abuse,” and that “a labial injury ... is a very significant finding” of abuse. In its rebuttal, the government called Dr. Randall Alexander, a member of the Board of Governors of the National Committee to Prevent Child Abuse. Dr. Alexan *566 der testified that it takes considerable force to inflict labial injuries like those exhibited by three of the victims. “It’s rare to see one [in young girls] and to see three of them show up is just ... rareness to the third power.”
On March 24, 1994, a grand jury indicted Feather, Hubbeling, Duane Rouse, Desmond Rouse, and Jesse Rouse on twenty-three counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(c). After a three week trial, the jury acquitted Duane Rouse. It convicted Desmond Rouse on three counts, Jesse Rouse on two counts, Feather on four counts, and Hubbeling on two counts. They received long prison sentences but raise no sentencing issues on appeal. We consolidated their four appeals.
II. Issues Concerning the Victims’ Trial Testimony.
The government’s case consisted primarily of testimony by the two physicians, the four oldest victims, another child who witnessed acts of sexual abuse, and FBI Agent Van Roe. On appeal, defendants raise numerous issues regarding the district court’s[1] handling of the critical child victim testimony.
A. Denial of Defense Access to the Children.
Prior to trial, the victims lived with foster parents in the legal custody of DSS. Defendants argue they were denied their Sixth Amendment right to effective cross-examination and their Fifth Amendment right to due process because DSS refused to permit defense counsel interviews of the victims before trial. Defendants also argue that the district court erred in refusing to order additional medical examinations of the victims prior to or during the trial, and lengthy pretrial psychological interviews by a defense expert.
1. When a child witness is in the legal custody of a social services agency, that agency as custodian may refuse requests for pretrial interviews. See Thornton v. State, 264 Ga. 563, 449 S.E.2d 98, 109-10 (1994); Hewlett v. State, 520 So.2d 200, 203-04, (Ala.Crim.App.1987); see also State ex rel. O’Leary v. Lowe, 307 Or. 395, 769 P.2d 188, 192-93 (1989) (en banc). In this case, defense counsel never complained to the district court that DSS denied them pretrial access to the child witnesses, so this issue was not preserved for appeal.[2] Defendants admit that DSS made the decision to deny access; they do not point to evidence that the prosecution interfered. Cf. United States v. Murdock, 826 F.2d 771, 773-74 (8th Cir.1987). In these circumstances, there was no error, much less plain error.
2. Defendants did file motions to compel additional medical examinations and psychological interviews. The evidence at a pretrial evidentiary hearing revealed that the victims received two medical examinations. Dr. Kaplan found physical evidence consistent with sexual abuse but did not perform thorough examinations. Instead, he referred the children to Dr. Ferrell, an obstetrician/gynecologist, who examined the anesthetized children using a colposcope instrument for magnified viewing of the genital area. Dr. Ferrell reported tearing and scarring of infant F. R.’s anal mucosa, and evidence of significant trauma to the other victims’ hymenal areas. He testified that this evidence as a whole indicated abuse.
Defendants argued that another examination was necessary because Dr. Kaplan’s examinations were not sufficiently thorough and Dr. Ferrell was not experienced in pediatric sexual abuse examinations. The victims’ guardian ad litem opposed additional medical examinations. The district court denied the motion for further examinations because the detailed reports of Drs. Kaplan and Ferrell were available to defendants, and no good cause had been shown “that it is necessary to the adequate defense of these cases for the alleged victims to again, for a third time, undergo these invasive procedures at the hands of strangers.”
*567 Regarding the request for psychological interviews, the hearing evidence revealed that social worker Kelson had counseled the victims but took no part in investigating the alleged abuse. Her focus was therapy, and her detailed reports were available to the defense. Defendants argued that their expert, psychologist Ralph C. Underwager, needed to interview the victims to demonstrate that suggestive interviewing and environmental pressures made the children’s testimony unreliable. The government advised that it would request interviews by its expert if defense interviews were allowed. The victims’ guardian ad litem opposed psychological examinations, particularly by adversarial experts. The district court denied defendants’ motion for interviews by Underwager because there “has not been good cause shown as to why this additional intrusion into the' alleged victims already troubled lives should be ordered.”
We agree with the district court that defendants’ showing of need for these examinations was insufficient. Drs. Kaplan and Ferrell were well qualified. Dr. Ferrell had ample experience conducting colposcopic examinations, had examined children in his practice, and had received training on sexual abuse during his residency. Dr. Kaplan examines six to seven hundred children each month for sexual abuse. He participated in Dr. Ferrell’s examinations, and concurred in his findings. Their detailed reports and findings were made available to defendants’ medical expert. And defendants extensively cross-examined Drs. Kaplan and Ferrell at trial.
Likewise, defendants did not establish need for the requested psychological interviews. Defense counsel and Dr. Underwager had access to Agent Van Roe’s interview reports and therapist Kelson’s extensive notes of her sessions with the children. Kel-son was called as a defense witness at trial and questioned about her counseling methods and contacts with the victims. Dr. Under-wager stated at the motion hearing that he had sufficient information to assess whether the children had been sexually abused.[3] He observed the trial testimony of the victims and therapist Kelson, assisted defense counsel at trial, testified regarding the- effects of child interview techniques, and was prepared to express opinions on the suggestibility of the investigative and therapeutic practices employed. See Spotted War Bonnet, 882 F.2d at 1362 (interview properly denied because defense expert reviewed other interview records and was present when victim testified).
Finally, the district court properly gave strong consideration to the victims’ interests. An adult witness may simply refuse to undergo adversarial medical or psychological examinations. See United States v. Bittner, 728 F.2d 1038, 1041 (8th Cir.1984) (“the defendant’s right of access is not violated when a witness chooses of her own volition not to be interviewed”). With child witnesses who are in protective custody, the issue is more complex because they are not able to make these difficult decisions for themselves. Of course, the court must protect a criminal defendant’s right to a fair trial, but it must. also protect the State’s paramount interest in the welfare of the child. Making court-ordered adversarial examinations routinely available would raise a barrier to the prosecution of this kind of crime by maximizing the trauma that its victims must endure. At a minimum, therefore, the court should heed a custodial agency’s opinion that pretrial access to the child for investigative or adversarial purposes is unnecessary or unwise.[4]
*568 Given the difficulty of balancing these important interests, we conclude that, if the custodian of a child witness opposes access as not in the child’s best interest, defendant must show that denial of access would likely result in an absence of “fundamental fairness essential to the very concept of justice” before the trial court need reach the question whether some type of access may appropriately be ordered.[5] Here, the victims’ guardian opposed access, and defendants did not show need for the requested examinations. The district court did not abuse its discretion in declining to order DSS to subject the victims to further medical or psychological examinations.
B. Victim Testimony by Closed Circuit Television.
Prior to trial, the government filed a motion to permit all child witnesses to testify by closed circuit television. At a hearing on this motion, therapist Kelson testified that the victims were afraid of defendants — “They still believe if they walked in the courtroom today that their uncles would attack them.” The district court denied the motion without prejudice, concluding there had not been a sufficient showing that the children could not testify due to fear of the defendants.
At trial, when three of the victims were called as witnesses and appeared to be emotionally unable to testify in open court, the district court questioned each child in chambers, in the presence of defense counsel, one prosecutor, the child’s guardian ad litem, and a court reporter. See 18 U.S.C. § 3509(b)(1)(C). Five-year-old J.R. was unable to speak when called to testify and stated in chambers that she was afraid to speak in front of her uncles. Considering this statement along with Kelson’s pretrial testimony, the court found that defendants’ presence in the courtroom would “more than anything else prevent her from testifying.” The court made similar findings after questioning six-year-old R. R., who was found sobbing outside the courtroom and affirmed in chambers that she was crying out of fear of her uncles; and nine-year-old T. R., who became so fearful before testifying that “the guardian ad litem would have had to physically pull her into the courtroom.” Defendants argue that the district court erred in permitting these three victims to testify by closed circuit television. (The other two child witnesses were able to testify in open court.)
The Sixth Amendment’s Confrontation Clause “guarantees the defendant a face-to-face meeting with the witnesses appearing before the trier of fact.” Coy v. Iowa, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). However, this right is not absolute and must accommodate the State’s “compelling” interest in “the protection of minor victims of sex crimes from further trauma and embarrassment.” Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982). Accordingly, “where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child’s ability to communicate, the Confrontation Clause does not prohibit use of a procedure” which preserves “the essence of effective confrontation” — testimony by a competent witness, under oath, subject to contemporaneous cross-examination, and observable by the judge, jury, and defendant. Maryland v. Craig, 497 U.S. 836, 851, 857, 110 S.Ct. 3157, 3166-67, 3169-70, 111 L.Ed.2d 666 (1990). Testimony by closed circuit television is a procedure now authorized by statute. See 18 U.S.C. § 3509(b).
Before invoking such a procedure, the district court must find that the child “would be traumatized, not by the courtroom generally, but by the presence of the defendant.” Hoversten v. Iowa, 998 F.2d 614, 616 (8th Cir.1993), quoting Craig, 497 U.S. at 856, 110 S.Ct. at 3169. See 18 U.S.C. *569 § 3509(b)(l)(B)(i) (child may testify by closed circuit television “if the court finds that the child is unable to testify in open court in the presence of the defendant ... because of fear”). In this ease, the district court made specific “because of fear” findings for three victims. Our review of the children’s responses to the court’s questions in chambers and the prior testimony by therapist Kelson persuades us these findings are not clearly erroneous. See United States v. Carrier, 9 F.3d 867, 870-71 (10th Cir.1993), cert. denied, 511 U.S. 1044, 114 S.Ct. 1571, 128 L.Ed.2d 215 (1994).
Defendants argue that the district court’s findings are inadequate because they were not based upon the expert testimony required by § 3509(b)(l)(B)(ii). However, the statute does not require an expert to support a “because of fear” finding. That finding may be based upon the court’s own observation and questioning of a severely frightened child. “[0]nee the trial has begun, the court may judge with its own eyes whether the child is suffering the trauma required to grant the requested order.” H.R.Rep. No. 101-681(1), 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6574. We also reject defendants’ contention that the closed circuit television system infringed their Sixth Amendment rights because defense counsel could not see the jury while cross examining the sequestered witnesses.[6] Compare Spigarolo v. Meachum, 934 F.2d 19, 24 (2nd Cir.1991).
C. Evidence of Victims’ Past Sexual Conduct.
The day before trial, the government filed a motion to preclude evidence of the victims’ past sexual activity because defendants had not filed written motions “at least 14 days before trial,” as required by Fed.R.Evid. 412(c)(1). Defendants then filed three untimely motions to offer evidence that one victim had engaged in sexual activity with another child living in her neighborhood, that another victim had made accusations of inter-household sexual activity,[7] and that a third victim had aeted-out in a sexual manner. The district, court excluded this evidence because the allegations flowed from an interview with a young boy almost three months before trial and therefore defendants had no good cause for their untimely motions. See Rule 412(c)(1)(A).
On appeal, defendants argue that the district court abused its discretion because they effectively gave Rule 412 notice by mentioning the victims’ sexual activity in their pretrial motion for independent medical examinations. We disagree. Rule 412 limits the admissibility of such evidence to protect the victims of rape and sexual abuse. See Provost, 875 F.2d at 177; United States v. Azure, 845 F.2d 1503, 1506 (8th Cir.1988). The Rule has strict procedural requirements, including a timely offer of proof delineating what evidence will be offered and for what purpose, and an in camera hearing at which the victim may respond. Defendants’ vague notice fell far short of complying with the Rule, and the district court properly excluded this evidence. See United States v. Eagle Thunder, 893 F.2d 950, 954 (8th Cir.1990).
D. Admission of Child Hearsay.
At trial, the government offered testimony by FBI Agent Van Roe of what four victims said during Van Roe’s initial interviews in January 1994. Defendants objected. After questioning Agent Van Roe outside the jury’s presence, the court admitted statements made by the three oldest victims under the residual hearsay exception, Fed. R.Evid. 803(24). On appeal, defendants argue that the district court abused its discretion in admitting this testimony.
This contention is at odds with “a formidable line of Circuit precedent that sanctions the use of hearsay testimony in *570 child sexual abuse cases.” United States v. St. John, 851 F.2d 1096, 1098 (8th Cir.1988). Here, the district court determined that FBI Agent Van Roe had been trained to interview children in abuse cases, interviewed the children individually at the home of their foster parent, and did not ask leading questions. Agent Van Roe’s testimony and interview notes established that the victims’ responses were spontaneous and not repetitious. The victims’ statements also provided more details regarding the abuse than their testimony at trial. In these circumstances, the district court did not abuse its discretion in admitting the initial interview statements. See United States v. Grooms, 978 F.2d 425, 426-28 (8th Cir.1992). Defendants also argue that admission of the victims’ statements violated the Confrontation Clause as construed in Idaho v. Wright, 497 U.S. 805, 815-16, 110 S.Ct. 3139, 3146-47, 111 L.Ed.2d 638 (1990). However, the Confrontation Clause was satisfied because the victims testified at trial. See Spotted War Bonnet, 933 F.2d at 1473.
III. Exclusion of Expert Testimony on Implanted Memory.
After failing to exclude or nullify the testimony of the child victims, the defense concentrated on undermining the credibility of that testimony. In addition to cross-examining the doctors, the victims, and FBI Agent Van Roe during the government’s case, the defense called therapist Kelson and DSS witnesses as adverse witnesses, seeking to prove that the children were forcibly removed from Rosemary Rouse’s home and then interviewed at length by many government investigators.[8] The culmination of this defense was the testimony of psychologist Underwager as a defense expert witness.
The district court held a preliminary hearing to explore whether Dr. Underwager’s proposed testimony was sufficiently reliable scientific evidence that would assist the jury to understand a fact in issue. See Fed. R.Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591-93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The court heard Dr. Underwager’s proposed testimony concerning his theories of “learned” or “implanted” memory. After reviewing scientific research and publications offered in support of these theories, the court made two preliminary rulings:
I’m not going to allow Dr. Underwager to testify as to whether or not the [child] witness’s testimony is believable or not, or telling the truth or not.
[W]ith regard to the principles and the methodology, this is an area of valid scientific inquiry, but there is not anywhere near yet the agreement in the community as to methods, techniques, testings or reliability that would warrant the admissibility before a jury of these matters____ It would result in a confusion of the issues, a possible misleading of the jury by undue reliance possibly being placed upon [one side’s methodology]. So, for these reasons, under Daubert, I’m not going to allow evidence with regard to the different ... psychological methods of evaluating the reliability of witnesses.
Later in the trial, Dr. Underwager was called as a defense witness. He testified at length concerning his own research into the ways in which the reliability of children’s allegations of physical or sexual abuse may be tainted by adult questioning practices that suggest false answers or even implant false memories. Dr. Underwager identified for the jury practices of “suggestibility” that produce unreliable child testimony — use of leading or coercive questions; communicating adult assumptions that cause the child to give what is perceived as the desired answer; [9] repetitive questioning; play therapy, *571 which Dr. Underwager opined has “no scientific support”; adult use of rewards or negative reinforcement that motivate children to lie; and “cross germination” among a group of children who pick up stories from each other. Dr. Underwager opined that “a memory can be created ... by questioning someone.” Moreover, “[t]he younger the child, the greater the suggestibility, the more vulnerable they are to the influences.”
When the prosecution successfully objected to some questions put to Dr. Underwager, defendants made an offer of proof at the end of his direct examination. In a three-page narrative answer to the question whether “there’s been a practice of suggestibility employed” with the child victims, Dr. Under-wager opined (i) that therapist Kelson had exerted “massive social influence” on the victims; (ii) that Kelson engaged in “highly suggestive and highly contaminating” practices; (iii)- that the prosecutor used leading questions at trial and the children “were comfortable doing the yes/no bit,” showing “they’d learned” to answer yes; (iv) that Van Roe’s use of diagrams was “very suggestive and very leading”; (v) that the children “were kidnapped ... taken from their families, taken to this strange place where all of the people are concerned that they talk about sex abuse”; and (vi) that the “total environment [was] one of the most powerful- and coercive influences upon children that I’ve seen.” The district court excluded these opinions as not proper subjects of expert opinion.
On appeal, defendants argue generally that the district court misapplied Daubert in excluding Dr. Underwager’s testimony. We find two distinct components to this issue. First, we conclude that the district court’s preliminary pretrial rulings regarding the scope of Dr. Underwager’s testimony did not abuse its discretion. See Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir.1995) (standard of review). It is clear from the record that this expert was intent upon expressing his ultimate opinion that the victims’ accusations of sexual abuse were not credible.[10] But assessing the reliability or credibility of a victim’s accusations is the exclusive function of the jury. Dr. Underwager’s opinions about witness credibility were properly excluded. See Westcott v. Crinklaw, 68 F.3d 1073, 1076 (8th Cir.1995); United States v. Whitted, 11 F.3d 782, 785-86 (8th Cir.1993); United States v. Azure, 801 F.2d 336, 339-40 (8th Cir.1986).[11] The district court was also well within its discretion in ruling that Dr. Underwager should not embellish his own research and opinions by telling the jury about the research and writings of other psychologists because these works have not produced a consistent body of scientific knowledge and therefore admission of other theories and writings would result in a battle of experts that could confuse or even mislead the jury.
The second issue, whether the court erred in rejecting defendants’ offer of proof at trial, is more difficult. Indeed, it is an issue on which we continue to disagree. A qualified expert may explain to the jury the dangers of implanted memory and suggestive practices when interviewing or questioning child witnesses, but may not opine as to a child witness’s credibility. That leaves a troublesome line for the trial judge to draw — as the expert applies his or her general opinions and experiences to the ease at hand, at what point does this more specific opinion testimony become an undisguised, impermissible comment on a child victim’s veracity? The issue was unusually difficult for the district court in this case because defendants made their offer of proof through Dr. Underwager’s three-page monologue, instead of asking the court to rule on specific questions and answers, and because of Dr. Underwager’s *572 obvious desire to testify impermissibly on the children’s lack of credibility.
Our differing views on the question whether the district court erred in rejecting defendants’ offer of proof are set forth in the vacated panel opinions. See Rouse, 100 F.3d at 566-74, 582-85. Having again considered this issue in light of the voluminous trial record, a majority of the panel has concluded that exclusion of this additional expert testimony was, in any event, harmless error. We base this conclusion on a number of factors. First, the jury heard evidence as to the interviewing techniques used by foster parent Jordan, therapist Kelson, and FBI Agent Van Roe. It learned of the social influences affecting the victims at the time they accused their uncles of sexual abuse. And it observed the victims testily and knew that the prosecutor asked the children leading questions at trial.[12] Second, the jury heard Dr. Underwager describe at length the ways in which adults can influence children’s memories and the possible impact of such influences on their credibility. Defense counsel used this expert testimony to define their theory of implanted memory in closing argument:
The questions were asked over and over and over again and, when the story came out the way the adults wanted it, then the children were rewarded.... [W]hen [J.R.] was testifying ... did you notice [the prosecutor] ... phrased most of the questions in a manner in which she would .get a positive response, a “Yes” answer. ... [Dr. Underwager] talked about the influence that people have on children, when they interview kids. He talked about memory, the process of reconstruction, implantation of memory, play-therapy, worthless---- The children only felt comfortable answering “Yes” or “No”. They didn’t show memory of the events. The FBI Agent’s diagram that he used, the drawing of the male body with the penis drawn in, what did that tell the kids that he wanted to talk about? Everything was calculated to produce some sort of compliance with these kids....
This gave the jury an informed basis on which to make its ultimate determinations as to the victims’ credibility. Third, the victims’ trial testimony was consistent with their “free recall” — R. R.’s reports of abuse to Jordan and Kelson in early January, and the four oldest victims’ reports to Dr. Kaplan during his initial medical examinations. These unprogrammed disclosures preceded the FBI interviews and Ellen Kelson’s therapy. Dr. Underwager testified for the defense that, “[b]asically, the most reliable information is obtained from free recall.” In these circumstances, we conclude that exclusion of additional testimony by Dr. Under-wager regarding whether a “practice of suggestibility” was employed on the victims “could not have had substantial influence on the outcome of the case,” Azure, 845 F.2d at 1507, the governing harmless error standard. See 28 U.S.C. § 2111; Brecht v. Abrahamson, 507 U.S. 619, 630-32 & n. 7, 113 S.Ct. 1710, 1718 & n. 7, 123 L.Ed.2d 353 (1993).
IV. Juror Bias.
After the trial, Verna Severson, who worked with juror Patricia Pickard at a local preschool, called the Clerk’s Office to complain that Pickard should not have served on the jury because she is prejudiced against Native Americans. The court held an evi-dentiary hearing on this issue. Severson testified that Pickard made derogatory statements about Native Americans before the trial; Pickard denied this allegation. Sever-son alleged that Pickard refused to teach a Native American unit in her class; Pickard and the school’s director testified that Pick-ard had taught a Native American unit for years. Severson testified that Pickard had stated, “it’s a sad thing to be born an Indian girl because Indian girls are used for sexual purposes”; Pickard explained that her sister-in-law, a counselor, made that comment after the trial and Pickard had repeated it not as her own belief. Three of Pickard’s other coworkers testified that Pickard is not a racist. *573 Two witnesses questioned Severson’s reputation for truthfulness.
After hearing this testimony, the district court denied defendants’ motion for a new trial, finding that juror Pickard had “responded honestly and accurately” during voir dire and had not concealed “any racially prejudiced attitudes, beliefs, or opinions” about Native Americans. The court found that “as between juror Pickard and Ms. Severson, juror Pickard [was] the more credible witness.” The court further found that the jury foreman and an alternate juror “testified credibly that they did not hear juror Pickard make racially disparaging remarks about the defendants or about Native American people during the trial,” and “that no improper outside influence affected the jury.” These findings are not clearly erroneous. They establish that defendants are not entitled to a new trial because of juror Pickard’s responses during voir dire. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); United States v. Whiting, 538 F.2d 220, 222-23 (8th Cir.1976).
Defendants further argue that they are entitled to a new trial because juror Pickard admitted that she laughed at a comment about Native Americans during the jury deliberations. However, we agree with the district court that this neither overcame the court’s finding that the jury was not subjected to improper outside influence, nor justified further inquiry into the validity of the verdict. See Fed.R.Evid. 606(b); Tanner v. United States, 483 U.S. 107, 120-27, 107 S.Ct. 2739, 2747-51, 97 L.Ed.2d 90 (1987).
Y. Jurisdiction Issues.
After both sides rested, defendants moved for judgments of acquittal on the ground that the government had failed to prove the alleged offenses occurred in Indian Country. The government responded by moving to reopen its case to better establish that the alleged sexual abuse occurred at grandmother Rosemary’s home on the Yank-ton Sioux Reservation. After expressly considering both the possible prejudice to defendants in reopening, and the impact on the child victims of having to testify again, the district court ruled that the government could reopen to offer limited evidence regarding offense location. The parties then stipulated that this evidence would establish that all alleged offenses except those involving J.R. had occurred in Indian Country. The government reopened its case and placed this stipulation into evidence, and the court denied defendants’ motions for judgment of acquittal.
A. Allowing the Government To Reopen Its Case.
Defendants first argue that, the district court abused its discretion by permitting the government to reopen its case to establish this jurisdictional fact. The trial court has broad discretion to allow the prosecution to reopen to establish an element of an offense after the, defendant has moved for judgment of acquittal. See, e.g., United States v. Powers, 572 F.2d 146, 152-53 (8th Cir.1978), involving whether the weapon at issue was a “firearm.” The relevant inquiry is “whether the evidence caused surprise to the defendant, whether he was given adequate opportunity to meet the proof, and whether the evidence was more detrimental to him because of the order in which it was introduced.” United States v. Webb, 533 F.2d 391, 395 (8th Cir.1976). Here, defendants were not surprised by the evidence, and the district court carefully limited its ruling to avoid prejudice from allowing victim testimony late in,the trial. There was no abuse of discretion.
B. Insufficient Evidence of Jurisdiction.
Defendant Jesse Rouse also argues that there was insufficient evidence that he sexually abused J.R. in Indian Country, a fact essential to federal jurisdiction over that offense. See 18 U.S.C. § 1153(a). The trial testimony focused on events that occurred at “grandma’s house,” grandmother Rosemary Rouse’s home in Indian Country. J.R. testified that she lived in Marty, that she spent a lot of time at grandma’s house, and that her uncles were often in that house. She testified that it was not safe at the house “[b]e-cause our uncles are doing naughty stuff to us.” Jesse testified that he lived at Rose *574 mary’s house from September 1993 until the victims were removed in January 1994. Viewing this evidence in the light most favorable to the jury’s verdict, as we must, we agree with the district court that there was sufficient evidence to support the jury’s finding of jurisdiction.
The judgments of the district court are affirmed.

. The Honorable LAWRENCE L. PIERSOL, United States District Judge for the District of South Dakota.

. Because one defense theme at trial was that DSS contaminated the victims as witnesses by isolating them in the months before trial, defendants’ failure to raise this access issue with the district court was no doubt by design.

. Defendants did not tell the district court that psychological examinations were needed to determine the victims' competency to testify. On appeal, defendants argue that proper hearings were not held to assess competency, but they filed no written motion in the district court for competency examinations and thus failed to preserve this issue. See 18 U.S.C. § 3509(c)(2-4); United States v. Spotted War Bonnet, 882 F.2d 1360, 1362-63 (8th Cir.1989) (subsequent history omitted). Children are presumed competent to testify, and the district court made specific findings that each child witness was competent.

. Unlike the court in United States v. Benn, 476 F.2d 1127, 1130-31 (D.C.Cir.1973), we do not assume that the court presiding over a criminal case may compel pretrial testing of a child that a social services arm of government believes to be adverse to the child’s best interests. To posit an extreme example, if a government custodian should opine that the interests of a child witness *568 require dismissing a prosecution rather than compelling the child to undergo further traumatic testing, and if the court can devise no other way to protect the defendant’s right to a fair trial, the criminal case may have to be dismissed.

. This is the basic test for a denial of due process. See United States v. Valenzuela-Bernal, 458 U.S. 858, 872, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982).

. The system included five monitors in the courtroom for the judge, jury, defense expert, and defendants to view the child testifying in chambers; a monitor for the child witness to view defendants as she testified; and separate communication lines permitting each defendant to confer with his attorney.

. Evidence that the victim has accused others of sexual abuse is subject to Rule 412's limitations. United States v. Provost, 875 F.2d 172, 177-78 (8th Cir.), cert. denied, 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989).

. Without citing specific instances of error or supporting authority, defendants argue that the district court erred by failing to control witness Kelson. We have reviewed this portion of the trial testimony and conclude that the court properly exercised its discretion in maintaining reasonable control over the examination and testimony of this witness. See Fed.R.Evid. 611(a); United States v. DeLuna, 763 F.2d 897, 911 (8th Cir.), cert. denied, 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

. Dr. Underwager testified that "preconceived assumptions of the interviewer are the single most powerful determinant of what comes out of an interview.”

. In a letter to defense counsel just before trial that became a preliminary hearing exhibit, Dr. Underwager said he was prepared to opine "that the children in this case have been subjected to massive and coercive social influence by adults ... such as to make it highly likely any statements are so contaminated by adult behaviors as to be unreliable."

. In this regard, we note that Dr. Underwager’s attempts to express such opinions in other child abuse cases have been consistently rejected. See State v. Swan, 114 Wash.2d 613, 790 P.2d 610, 632 (1990) (en banc), cert. denied, 49§ U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991); State v. Erickson, 454 N.W.2d 624, 627-29 (Minn.App.1990).

. When the first child witness (the nine-year-old male cousin) froze on the stand in open court, the district court, consistent with numerous Eighth Circuit cases, ruled that leading questions could be asked of reticent child witnesses. Defendants did not object to this ruling nor raise the issue on appeal.