**VIRGIN ISLANDS WASTE MANAGEMENT AUTHORITY, a Public Virgin Islands Corporation; JOHN DOE, INC.; JOHN DOE; JAMES JOE and A-9 TRUCKING ENTERPRISE, INC., Appellants/Defendants**

**v.**

**BOVONI INVESTMENTS, LLC, in its own capacity and as Assignee of RICHARD WOODLAND, ROBERT WOODLAND, DEBRA LYNN VIALET, DAVID LEON VIALET, Executor of the ESTATE OF ISABELLE SCHERZI and the Executor of the ESTATE OF MARGARET M. PHILIPSON, Appellees/Plaintiffs, GOVERNMENT OF THE VIRGIN ISLANDS, DEPARTMENT OF PUBLIC WORKS, Appellee/Defendant**

S. Ct. Civil Nos. 2013-0069, 2013-0080

Supreme Court of the Virgin Islands

October 7, 2014

KERRY E. DRUE, ESQ., Law Offices of Kerry E. Drue, St. Thomas, USVI, *Attorney for Appellant Virgin Islands Waste Management Authority*.

JENNIFER JONES, ESQ., St. Thomas, USVI, *Attorney for Appellant A-9 Trucking Enterprise, Inc.*

TRESTON E. MOORE, ESQ., Moore, Dodson & Russell, P.C., St. Thomas, USVI, *Attorney for Appellee Bovoni Investments, LLC.*

PAUL J. PAQUIN, ESQ., Deputy Solicitor General, St. Thomas, USVI, *Attorney for Appellee Government of the Virgin Islands, Department of Public Works.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and WATLINGTON, *Designated Justice.*[1]

## OPINION OF THE COURT

(October 7, 2014)

HODGE, *Chief Justice*. A-9 Trucking Enterprise, Inc. ("A-9") and the Virgin Islands Waste Management Authority ("WMA") appeal a Superior Court judgment holding them liable for trespass and conversion of property owned by Bovoni Investments, LLC. The Superior Court erred in concluding that the claims against the Government of the Virgin Islands, Department of Public Works ("DPW") were barred based on the Virgin Islands Tort Claims Act, 33 V.I.C. §§ 3401 to 3417 ("VITCA"). The Superior Court also committed clear error in making certain findings of fact. Accordingly, we reverse and remand for further consideration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pursuant to a land sale agreement entered into in November 2005, a predecessor in interest to Bovoni Investments contracted to purchase approximately 60 acres of undeveloped land adjoining a parcel known in these proceedings as the Bovoni Landfill, in St. Thomas.[2] Bovoni Investments thereafter came to believe that soil from part of their contracted purchased acreage, Parcel 18-M-1, was being excavated by DPW and WMA and used for work on the Bovoni Landfill. On March 15,

---

[1] Associate Justice Ive Arlington Swan has been recused from this matter. The Honorable Debra S. Watlington, a Superior Court Judge, sits in his place by designation pursuant to 4 V.I.C. § 24(a).

[2] Boyd Holdings USVI, LLC, purchased the property and later assigned its interests to Bovoni Investments.

2007, Bovoni Investments — in its own capacity and as assignee of Richard A. Woodland, Robert Woodland, David L. Vialet, Debra L. Vialet, the executor of Isabelle C. Scherzi's estate, and the executor of Margaret M. Philipson's estate — brought an action for trespass and conversion, among other claims, against A-9, WMA, and DPW. A bench trial was held on October 5, 2011, November 30, 2011, and March 5, 2012.

The evidence introduced at trial established that, since 1979, DPW has hired private contractors to assist in its landfill management. From October 1, 2000, until September 30, 2006, DPW hired A-9 to compact garbage deposited in the Bovoni Landfill, using dirt and soil to cover the garbage on a daily basis.[3] Specifically, A-9 was to "deposit [a] minimum of 600 cubic yards of cover material to the site where the garbage [was] being covered daily at the site(s) designated."

Roan Creque, Director of Sanitation for DPW in 2000, testified regarding the relationship between contractors, like A-9, and DPW. Creque was responsible for showing the contractors maps of the designated areas and identifying the boundaries within which the contractors were to work. Ultimately, though, contractors took day-to-day direction from DPW's Landfill Manager, who gave directions to contractors on where to dig holes and directed the garbage trucks to the holes in which they were to dump garbage. Once the garbage was in a hole, the Landfill Manager directed the contractors on where to obtain dirt and soil to cover that hole.

A-9's former President and current Treasurer, Lester Ashby,[4] testified that Rasheed Mumin was the Landfill Manager during the time A-9 was under contract with DPW. Lester explained that A-9 merely continued excavating in the area where previous contractors had left off and he never inquired about land ownership. Lester stated that neither Mumin nor anyone else from DPW provided A-9 with any map showing where

---

[3] Specifically, A-9 first contracted with DPW for the period of October 1, 2000, through September 30, 2002. A-9 and DPW twice exercised the renewal options under the contract to cover the period of October 1, 2002, to September 30, 2004, and then from October 1, 2004, to September 30, 2006. A-9 also entered into a contract with WMA on February 28, 2007, which retroactively covered work performed during the period of October 1, 2006, to September 30, 2007.

[4] Because multiple witnesses possess the same last name, we refer to these witnesses by their first names to minimize confusion.

A-9 could or could not excavate cover material. Instead, Lester testified that Mumin instructed A-9 to take dirt from the land adjacent to the landfill, which created a large hole. Lester estimated that A-9 removed dirt from this area from approximately 2002 until 2007. A-9's current President, Jimez P. Ashby, testified that A-9 began removing dirt from the land adjacent to the Bovoni Landfill in 2003 or 2004. Like Lester, Jimez testified that Mumin instructed A-9 to take cover material from this land.

On January 23, 2004, Governor Charles W. Turnbull signed Act No. 6636, creating WMA.[5] May Cornwall signed her employment contract on May 12, 2005, to become Executive Director of WMA. She testified that according to Act No. 6636, WMA was to assume responsibility for all solid waste management in the Territory, and the transition period for this to happen was "suppose[d] to be" within 365 days of her hiring. According to section 2(a) of Act 6636, WMA was to honor all contracts executed prior to the date of the bill's enactment into law and had the option to honor those contracts executed afterward. Section 2(a) also stated that WMA would not be liable for any claims, damages, penalties, or liabilities arising out of or based on matters occurring prior to the transfer of the equipment and assets to WMA's control.

Sometime between February and April 2005, real estate agent Kerry Klein showed prospective purchaser Joseph W. Boyd, Jr. property referred to as "Remainder 17 Estate Bovoni," which adjoined the Bovoni Landfill. Klein testified that at this time she did not notice any excavation on Parcel 18-M-1, but did notice some grading. Boyd also testified that he did not see a hole on Parcel 18-M-1 during his visit in 2005. Boyd further clarified that he was not inspecting the land of Parcel 18-M-1 at this time — instead he was inspecting Remainder 17 Estate Bovoni — so "[t]here might have been disturbed land [on Parcel 18-M-1]."

After Klein showed Boyd Remainder 17, Boyd expressed interest in the adjacent land, Remainder 18 Bovoni, specifically Parcels 18-M, 18-K, and 18-J. Klein had trouble determining the ownership of this property, but eventually discovered the owner's identity and that they were willing

---

[5] WMA is a government corporation, independent of the Government of the Virgin Islands and similar in structure to the Virgin Islands Water and Power Authority and the Virgin Islands Port Authority. 29 V.I.C. § 494.

to sell. On November 17, 2005, Boyd Holdings USVI, LLC,[6] entered into a land sale agreement to purchase Parcels 18-M, 18-K, and 18-J, totaling 59 acres of land, from Richard Woodland, Robert Woodland, David L. Vialet, Debra L. Vialet, the executor of the Estate of Isabelle Scherzi, and the executor of the Estate of Margaret Philipson (collectively "sellers").

On or about December 2005, Michael Bornn, an agent for Boyd Holdings USVI, LLC, observed A-9 trucks excavating soil from what he believed was the south part of the property of Parcel 18-M, which created a "massive scar and hole" on the property. Sometime after making this observation, Bornn went to Jimez's office and explained his belief that A-9 was excavating Boyd Holdings' land. While in Jimez's office, Jimez telephoned DPW Commissioner Wayne Callwood to relay Bornn's concerns. Callwood said he would look into it and get back to them.

Boyd Holdings commissioned land surveys in January 2006, confirming that excavation was being conducted on Parcel 18-M-1. This same month, as a result of these surveys, Boyd Holdings had the land sale agreement amended with the sellers to reflect a reduction in price, in the amount of $104,009, due to the excavation found on Parcel 18-M-1.

On June 9, 2006, Boyd Holdings subdivided Parcel 18M into two separate parcels, 18-M-1 and 18-M-Rem and assigned its rights under the land purchase agreement for Parcel 18-M-1 to Bovoni Investments. On December 15, 2006, Richard Woodland, one of the sellers, signed six notices of intention to file a claim that were served on the Attorney General on January 29, 2007, seeking compensation for the excavation done on Parcel 18-M-1. On January 26, 2007, the Sellers tendered a special warranty deed to Bovoni Investments for Parcel 18-M-1. A few days later, on January 31, 2007, the sellers executed an assignment of claims in favor of Bovoni Investments for claims arising prior to and since December 22, 2005.

Harry Gauriloff, a certified land surveyor, testified as an expert witness regarding how much soil was excavated from Parcel 18-M-1. In early 2007, Gauriloff performed a survey of Boyd Holdings' land and, in a letter dated March 2007, reported his findings. Gauriloff compared his own 2007 topographical survey of Parcel 18-M-1 to an aerial survey that

---

[6] Boyd Holdings USVI, LLC, is a sole member of Bovoni Investments, LLC, a Virginia limited liability company. Boyd Holdings is co-managed by Joseph Boyd and Boyd Corporation. Boyd is the sole stockholder and Chairman of the Board of the Boyd Corporation.

the U.S. Army Corps Engineers had published in 1995 covering the same area, and concluded that 150,000 cubic yards of earth had been removed from Parcel 18-M-1.

There was conflicting testimony regarding how much the soil removed from Parcel 18-M-1 was worth. Bornn testified that the value of the top soil at .the time of trial was $10 to $18 per cubic yard. Testimony also revealed WMA paid other companies for the purchase of cover material from $4 to $6 per cubic yard.

On July 23, 2013, the Superior Court entered a summary of its findings of fact and conclusions of law on the record, and then signed a judgment and opinion on July 31, 2013, that was entered August 2, 2013, setting forth its analysis, findings, and conclusions. First, the Superior Court dismissed all claims against DPW, concluding that Bovoni Investments failed to adhere to the notice requirements of the VITCA. Second, the Superior Court concluded that from March 15, 2005, until February 28, 2007 — 716 days — 150,000 cubic yards of Bovoni Investments' dirt was trespassed upon and converted. The Superior Court further found that all contracts relating to waste management were transferred to WMA control by December 12, 2005. Therefore, the court held WMA and A-9 jointly and severally liable to Bovoni Investments for trespass and conversion in the amount of $495,090,[7] representing 93,018 cubic yards of soil and cover material taken from December 12, 2005, to February 28, 2007, valued at $5 per cubic yard. The Superior Court also found A-9 solely liable for trespass and conversion of Bovoni Investments property in the amount of $284,910 for the period of March 15, 2005, to December 11, 2005. Lastly, the Superior Court dismissed the other claims of boundary encroachment, negligence, deprivation of rights under color of law, and civil conspiracy. A-9 filed a timely notice of appeal on August 30, 2013. *See* V.I.S.CT.R. 5(a)(1). WMA also filed a timely notice of appeal on September 25, 2013. *Id.*

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as

---

[7] The Superior Court apparently made a mathematical error and the correct amount should be $465,090, which is the result when multiplying 93,018 cubic yards by $5 per yard.

otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). Since the Superior Court's July 31, 2013 judgment is a final order within the meaning of section 32, this Court possesses jurisdiction over this appeal. *Etienne v. Etienne*, 56 V.I. 686, 690-91 (V.I. 2012).

The standard of review for this Court's examination of the Superior Court's application of law is plenary, while the Superior Court's factual findings are only reviewed for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). We review issues of statutory interpretation *de novo*. *In re Estate of George*, 59 V.I. 913, 922 (V.I. 2013) (citing *Kelley v. Gov't of the V.I.*, 59 V.I. 742, 745 (V.I. 2013)).

## B. Claims Against DPW

 The Superior Court dismissed all claims against DPW, concluding that it lacked subject matter jurisdiction given Bovoni Investments' failure to adhere to the notice requirements under the VITCA. While this Court has not expressly determined whether a party's failure to follow the VITCA deprives the Superior Court of jurisdiction, since the Superior Court characterized it as jurisdictional, dismissing all claims against DPW for lack of subject matter jurisdiction, we can review this jurisdictional determination *sua sponte*. *In re Guardianship of Smith*, 54 V.I. 517, 527 (V.I. 2010) (an appellate court may *sua sponte* raise questions regarding a trial court's subject matter jurisdiction); *Chavayez v. Buhler*, S. Ct. Civ. No. 2007-060, 2009 V.I. Supreme LEXIS 26, *7 (V.I. June 25, 2009) (unpublished) ("[I]t is well established that a court may consider the issue of subject matter jurisdiction *sua sponte*.").

The Superior Court relied upon the notice requirement of 33 V.I.C. § 3409(c), which applies to "a claim to recover damages for injuries to property or for personal injury caused by the tort of an officer or employee of the Government of the United States Virgin Islands." Section 3409(c) requires a claimant to file a claim, or a notice of intention to file a claim, within ninety days of accrual of the cause of action. In this case, the Superior Court concluded that since Richard Woodland's notice of intention was not filed within the ninety-day claim or notice period prescribed in subsection (c), the failure to adhere to the notice requirements denied the Superior Court subject matter jurisdiction over the case against DPW.

██ However, the Superior Court erred in applying the claim filing limitation period prescribed in § 3409(c) because the limitation period in

§ 3409(a) applies to Bovoni Investments' claims against DPW.[8] Section 3409(a) requires that an aggrieved party file a claim within two years after it accrues, and this prescribed claim period applies to "claim[s] for the appropriation by the Government of lands, or any right, title of interest in or to lands." The VITCA was in part modeled after New York's Court of Claims Act. *Brunn v. Dowdye*, 59 V.I. 899, 909 (V.I. 2013). When the Virgin Islands Legislature borrows a statute from another jurisdiction, the local enactment is, absent any evidence to the contrary, "construed to mean what the highest court of that jurisdiction construed it to mean before the Legislature adopted it." *Id.* However, decisions from the source jurisdiction made after the enactment of the statute in the Virgin Islands are not controlling, but persuasive only. *Id.*; *see also Chinnery v. People*, 55 V.I. 508, 519 n.6 (V.I. 2011).

■ The Legislature enacted § 3409(a) of the VITCA in 1971, modeling it after subsection 1 of section 10 of the New York Court of Claims Act.[9] New York's highest court had previously held, in an opinion by Judge Benjamin Cardozo, that the government's taking of buildings and other fixtures that are attached to or otherwise part of the land fall within the definition of "appropriation . . . of lands" under subdivision 1 of section 10 of the Court of Claims Act. *Jackson v. State*, 213 N.Y. 34, 106 N.E. 758, 758 (1914) ("An appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures, and so it has frequently been held."). Additionally, New York's intermediate appellate court has more. recently held that the degree of interference with the owner's property rights is the key factor when distinguishing between a *de facto* taking or appropriation on one hand, and a tort such as trespass on the other. *Stewart v. State*, 248 A.D.2d 761, 669 N.Y.S.2d 723, 724 (1998). "[W]here the interference

---

[8] In its complaint, Bovoni Investments simply cited to 33 V.I.C. § 3409 as the basis of its governmental tort claims, without specifying a subsection. However, the language of its complaint clearly states a claim for an appropriation of land: "Defendants wrongfully severed and removed the soil from Plaintiff's real property without its consent and converted it to their own use." Therefore, the Superior Court applied the incorrect subsection of § 3409.

[9] *Compare* 33 V.I.C. § 3409(a) ("[A] claim for the appropriation by the Government of lands, or any right, title of interest in or to lands shall be filed within two years after the accrual of such claim."), *with* N.Y. CT. CL. ACT § 10(1) ("A claim for the appropriation by the state of lands, or any right, title or interest in or to lands shall be filed within three years after the accrual of such claim.").

with property rights is only temporary, casual, or intermittent, without any permanent use or appropriation or destruction of an existing right, there is a mere trespass and not a taking." *Id.* (citing 51 N.Y. JUR. 2D *Eminent Domain* § 88; *see American Woolen Co. v. State*, 195 A.D. 698, 187 N.Y.S. 341, 345 (1921); *see also Carr v. Town of Fleming*, 122 A.D.2d 540, 504 N.Y.S.2d 904, 906 (1986). Furthermore, although not interpreting the Court of Claims Act, prior to the adoption of § 3409(a) in the Virgin Islands, a New York court had characterized an agreement to sell the right to take soil from a piece of property as "a sale of an interest in land." *Longo v. Shaker Heights Dev., Inc.*, 11 Misc. 2d 278, 177 N.Y.S.2d 354, 355 (1958).

██ In this case, DPW's permanent removal and use of the soil from Bovoni Investments' property constitutes an appropriation of land and, therefore, § 3409(a) applies. If an appropriation includes all that is annexed to the land, certainly excavated and removed soil — the land itself — must also be considered under the same definition of appropriation. This reasoning is reinforced by the characterization of the sale of soil as an "interest in land" under New York law at the time the VITCA was adopted. Additionally, the degree of interference with Bovoni Investments' property rights is of a permanent nature, as opposed to casual or intermittent. The soil was not merely excavated and left on Bovoni Investments' property; the soil was taken and permanently used as cover material in the Bovoni Landfill. Also, damages in this case were measured by the value of the soil removed and used, as opposed to the cost to make Bovoni Investments' property whole, providing additional support for the conclusion that the removal and use of the soil was an appropriation of land.

Thus, the Superior Court erred in concluding that it lacked subject matter jurisdiction over the claims relating to DPW because, under the applicable provision of § 3409(a), Bovoni Investments had two years, not ninety days, from the accrual of the claim in which to file its claim.[10] Since DPW fully participated at the trial, we remand for the Superior

---

[10] Although DPW's actions may constitute an unconstitutional taking, and "sovereign immunity does not protect the government from a Fifth Amendment Takings claim because the constitutional mandate is self-executing," *Hair v. United States*, 350 F.3d 1253, 1257 (Fed. Cir. 2003), Bovoni Investments did not bring a takings claim and did not use any language in its complaint that would allow us to construe this as a takings claim. *See Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 254 (4th Cir. 2005) (Takings Clause claim insufficiently

Court to adjudicate the claims relating to DPW based on the evidence offered at trial.

## C. Factual Findings

A-9 and WMA challenge numerous factual findings made by the Superior Court. This Court will only reverse a factual finding by the Superior Court if it constitutes clear error. Clear error exists if the finding is completely devoid of minimum evidentiary support or bears no rational relationship to the supporting evidence. *Yusuf v. Hamed*, 59 V.I. 841, 857 (V.I. 2013) (quoting *In re Estate of Small*, 57 V.I. 416, 430 (V.I. 2012)). Applying this standard, we conclude that two of the Superior Court's findings of fact were clearly erroneous: 1) the start date of the conversion and trespass; and 2) the date that management of the Bovoni Landfill was transferred from DPW's control to WMA's control. We address each finding in turn.[11]

### 1. *Date the conversion and trespass began*

■ The Superior Court determined that conversion and trespass of the soil of Parcel 18-M-1 started on March 15, 2005, because this was when "Boyd noticed a disturbance on the land." However, Boyd testified that he did not know when the excavation of Parcel 18-M-1 actually began. Boyd repeatedly stated that the first time he learned about irregularity on the property was after he had the land surveyed in 2006. While Boyd did testify to noticing a "disturbance" on the land, he immediately clarified this statement by explaining that the "top [of the land] had been disturbed, but not to the point that [he] actually noticed anything." On cross-

---

pleaded where the "complaint makes no mention of the word 'property,' 'taken,' or 'just compensation' and does not put the [Government entity] on notice that [the claimant] intends to pursue a claim under the Takings Clause"); *cf. Club Comanche, Inc. v. Gov't of the V.I.*, 278 F.3d 250, 261 n.10 (3d Cir. 2002) (even where the plaintiff cited the Takings Clause in its complaint, this could not serve as a basis for federal question jurisdiction where the plaintiff "never requested relief in the form of 'just compensation,' never argued the 'takings' issue before the District Court, and has not argued before this court that the 'takings' clause serves as the basis for federal question jurisdiction").

[11] WMA also argues that the Superior Court erred in finding that Executive Director Cornwall was hired on May 12, 2005. Cornwell testified that she did not start work until May 16, 2005; however, she also testified that she signed her employment contract on May 12, 2005. Therefore, there was clearly a sufficient evidentiary basis for the Superior Court to find that Cornwall was hired on May 12, 2005.

examination, Boyd clarified that "there might have been disturbed land" on the property, but that he did not know if there actually was a disturbance in 2005 because he did not inspect Parcel 18-M-1 with Klein; rather, Klein showed him Parcel 17.

Importantly, no other witness testified to noticing a problem with Parcel 18-M-1 in March 2005. Bornn testified that he first discovered a hole on the property in December 2005. Gauriloff testified that he also recognized an encroachment on the property in December 2005. Moreover, both Lester and Jimez Ashby testified that A-9 began removing soil on or around Parcel 18-M-1 beginning in 2002 or 2004. Lastly, in closing arguments, counsel for Bovoni Investments indicated that the date of March 15, 2005 was chosen as the start of the conversion and trespass based on concern over the statute of limitations.

Therefore, the Superior Court's finding that March 15, 2005, was the start of the conversion and trespass based on Boyd noticing a "disturbance" is clearly erroneous. *Yusuf*, 59 V.I. at 857. Accordingly, we remand for the Superior Court to issue a new finding of fact, based on the evidence introduced at trial, regarding the date when the conversion and trespass began.

2. *Date of transfer of management of the Bovoni Landfill*

The Superior Court found that the management of the Bovoni Landfill was transferred from DPW to WMA on December 12, 2005. The Superior Court made this determination by merely picking a "date between Cornwall's hiring date and the last possible date the transfer could have occurred." This arbitrary selection of the date is clearly erroneous, especially given the fact that the date of the transfer of management of the Bovoni Landfill is critical for the calculation of damages against WMA.

No witness was able to provide an exact date when management of the Bovoni Landfill transferred from DPW to WMA, and no witness provided testimony supporting the Superior Court's finding that the transfer occurred on December 12, 2005. The evidence at trial demonstrated that A-9 contracted with DPW to work on the Bovoni Landfill from October 2000 until September 2006. WMA was created in January 2004 and was to assume responsibility for all solid waste management within 365 days of the hiring of Executive Director Cornwall. When Cornwall was asked

if WMA was involved in the Bovoni Landfill in 2006, she responded that "[p]rior to that as well[,] Your Honor, we were involved from the inception and transition. We were involved in the sense of having to manage and honor the contracts that were already there." In 2007, WMA entered into a *nunc pro tunc* contract with A-9 retroactively covering the period from October 2006 until February 2007 during which WMA had A-9 perform work at the site.

Therefore, the date of December 12, 2005, bears no rational relationship to the evidence provided at trial and is clearly erroneous. *See Bradford v. Cramer*, 54 V.I. 669, 673 (V.I. 2011); *St. Thomas-St. John Bd. of Elections*, 49 V.I. at 329. Thus, we remand for the Superior Court to issue new findings of fact, based on the evidence introduced at trial, to determine when transfer of management of the Bovoni Landfill changed from DPW to WMA.[12]

### D. Expert Testimony

██ ██ A-9 and WMA argue that Harry Gauriloff was not properly qualified as an expert witness under Federal Rule of Evidence 702[13] and

---

[12] A-9 also argues that the Superior Court erred in finding it liable for the removal of the entire 150,000 cubic yards of soil from Parcel 18-M-1 because there was no testimony that it created the hole in its entirety. Although there was testimony that A-9 started excavating in 2000 from where it believed other contractors had stopped excavating, there was also testimony from A-9 officials that it started excavating on Parcel 18-M-1 sometime in 2002 or 2004. Therefore, we cannot conclude that it was clear error for the Superior Court to find that A-9 was liable for the removal of the entire 150,000 cubic yards of soil. Additionally, the Superior Court found A-9 solely liable for the removal of soil from March 15, 2005, until December 11, 2005 and jointly and severally liable with WMA for the soil removed from December 12, 2005, to February 28, 2007. Since the March 15, 2005 date and December 12, 2005 date were clearly erroneous, and the Superior Court must adjudicate the claims relating to DPW, the Superior Court will also have to reconsider the apportionment of damages on remand.

[13] Federal Rule of Evidence 702 applies to Superior Court actions under Act No. 7161, in which the Legislature specifically repealed 5 V.I.C. §§ 771-956, replacing the Uniform Rules of Evidence with "the Federal Rules of Evidence, Pub. L. [No.] 93-595, § 1, January 2, 1975, 88 Stat. 1926, and all subsequent amendments thereto." 2010 V.I. Sess. Laws 50 (Act No. 7161, § 15(b)). The Superior Court recently questioned whether the Legislature intended to adopt the Federal Rules of Evidence as they existed at the time Act No. 7161 became law on April 7, 2010, or as later amended after this date as well. *People v. Ventura*, Super. Ct. Crim. No. 76/2012 (STX), 2014 V.I. LEXIS 53, *22 n.4 (V.I. Super. Ct. July 25, 2014) (unpublished). Because no substantive change to Federal Rule of Evidence 702 has been made since 2010, we need not resolve this issue here. But we note that since every provision of the Federal Rules of Evidence "is just as much a part of Virgin Islands law as any other enactment

that the methods he used to formulate his opinions and conclusions were unreliable. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The qualification requirement mandates " 'that the witness possess specialized expertise.' " *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). Additionally, the Supreme Court of the United States has made it clear that Rule 702's qualification requirement is interpreted liberally.[14]

---

passed by the Legislature and approved by the Governor," *Simmonds v. People*, 59 V.I. 480, 500 (V.I. 2013), the resolution of this question depends on whether the Legislature may delegate its authority to adopt provisions of Virgin Islands law to another body — in this case Congress and the United States Supreme Court — when lawmaking authority is vested exclusively in the Legislature by the Revised Organic Act of 1954. 48 U.S.C. § 1571(a) ("The legislative power and authority of the Virgin Islands shall be vested in a legislature, consisting of one house, to be designated the 'Legislature of the Virgin Islands.' "); *see also* 48 U.S.C. § 1611(c) ("The rules governing the practice and procedure of the courts established by local law . . . shall be governed by local law or the rules promulgated by those courts."); *Gov't of the V.I. v. Connor*, 60 V.I. 597, 602 (V.I. 2014) (noting the "inappropriate[ ] delegat[ion of] the judicial power of the Virgin Islands" through former 1 V.I.C. § 4 (repealed 2004)); *cf. Murrell v. People*, 54 V.I. 338, 347 (V.I. 2010) (this Court will consider "every reasonable construction that is not plainly contrary to the [L]egislature's intent prior to considering a serious challenge" to the statute's validity under the Revised Organic Act) (internal quotation marks omitted).

[14] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-89, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (characterizing the standard under all of the Federal Rules of Evidence as "a liberal one" and noting the Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony," and the "liberal thrust" of the expert qualification rule in particular); *See Pineda*, 520 F.3d at 237 (citing *Schneider*, 320 F.3d at 404, and *In re Paoli R.R. Yard PCB*

 Gauriloff testified to being a certified land surveyor since 1989, and a member of the National Professional Surveyor Association with some 26 years of experience at the time of his testimony. As a certified land surveyor, he performed topographic surveys of the surface of the earth, dealt with the volume of soil involved in landfills, subdivided property, and also assisted in the building of roads. While helping in the building of roads, Gauriloff stated that he regularly quantified dirt by volume. He further explained that his prior experience has included calculations in determining how much disturbance may occur to a piece of land and how many cubic yards of soil that disturbance would displace. Therefore, there was adequate evidence presented to support the Superior Court's decision to accept Gauriloff as an expert witness having "specialized expertise" in land surveying and the quantifying of excavations.

 A-9 also argues that Gauriloff's conclusions were based on unreliable methodology because his expert testimony does not meet the standard articulated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and cases implementing that decision. A-9 objected to the reliability of Gauriloff's methods for the first time during trial, arguing that his opinion testimony should be restricted to his one-page expert report. However, A9's objection never articulated or specified that Gauriloff's opinion testimony was inadmissible because it was based on unreliable scientific methods.[15] Accordingly, we deem A-9's trial objection as insufficient to preserve the *Daubert* issue on appeal. Supreme Court Rule 4(h) provides that "[o]nly issues and arguments fairly presented to the Superior Court may be

---

*Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)); *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (stating that the witness' qualifications to render an expert opinion are liberally judged by Rule 702); *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("In considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally."); *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) ("[W]e interpret Rule 702 "liberally in favor of the admission of expert testimony."); *see generally Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997).

[15] During trial, Attorney Chinnery, counsel for DPW, mentioned that she filed a motion on April 15, 2011, to exclude Gauriloff's testimony. Attorney Chinnery goes on to explain that this motion, which is absent from the record, argued that Gauriloff's testimony should be restricted to his one-page expert report. There is no mention that her motion to exclude Gauriloff was based on unreliable scientific methods.

presented for review on appeal." In addition, Rule 22(m) clearly provides that issues not properly raised are "deemed waived for purposes of appeal." In this case, A-9 never made a request for a *Daubert* hearing to challenge Gauriloff's methodology, despite having been provided with his expert report months before trial, alerting A-9 to the methodology and data Gauriloff used in reaching his conclusions. This Court recently explained that the Superior Court "is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists." *Malloy v. Reyes*, 61 V.I. 163, 183 (V.I. 2014). In addition, it is well established that an objection made at trial must be sufficiently specific in order for that objection to preserve an argument for appeal, and that an overly broad objection, or an objection asserting a related — but nevertheless distinct — argument, does not satisfy this requirement. *Yusuf*, 59 V.I. at 851 n.5 (where party objected at trial to admission of deposition testimony only under the rule of completeness, but failed to argue that it was improper for the trial court to take judicial notice of the deposition testimony as substantive proof of the matters asserted therein, the latter argument was deemed waived on appeal, because "[t]o preserve an objection on appeal, a party must object on the specific grounds raised on appeal, and 'a general objection or an objection on other grounds will not suffice.' ") (quoting *United States v. Gallo-Chamorro*, 48 F.3d 502, 507 (11th Cir. 1995)). Therefore, A-9's arguments regarding the reliability of Gauriloff's methods are waived due to its noncompliance with Supreme Court Rules 4(h) and 22(m).[16]

---

[16] A-9 raises numerous other arguments for the first time on appeal. Specifically, A-9 argues that is there was no proof of Bovoni Investments' immediate right to possess Parcel 18-M-1, an element needed to establish a valid claim for conversion and trespass, at any time prior to January 26, 2007. A-9 also makes two related arguments concerning the Superior Court's apportionment of damages. First, A-9 questions whether 5 V.I.C. § 1451(d) is applicable to claims concerning intentional torts. Second, A-9 argues that the Superior Court erred by finding A-9 and WMA jointly and severally liable, without assigning a specific degree of fault to A-9 and WMA for contribution purposes. Additionally, A-9 disputes the Superior Court's finding that there was no agency relationship between WMA and A-9. Lastly, A-9 argues that the Superior Court failed to consider the agency relationship between A-9 and DPW from the time of the beginning of the contract to the time that DPW no longer retained control of the Bovoni Landfill.

In civil cases, this Court generally considers all arguments made for the first time on appeal as waived, unless the party offering the argument demonstrates exceptional circumstances. V.I.S.Ct.R. 4(h) ("Only issues and arguments fairly presented to the Superior Court may be presented for review on appeal; provided, however, that when the interests of justice

## III. CONCLUSION

For the foregoing reasons, the Superior Court erred in dismissing the claims relating to DPW for lack of subject matter jurisdiction. Furthermore, the Superior Court clearly erred in its factual findings concerning the date that the conversion and trespass began and the date that management of the Bovoni Landfill changed. Accordingly, we reverse the Superior Court's judgment and remand for the Superior Court to adjudicate the claims relating to DPW as well as issue new findings of fact and conclusions of law based on the evidence presented at trial, in accordance with this opinion.

---

so require, the Supreme Court may consider and determine any question not so presented."); *St. Thomas-St. John Bd. of Elections*, 49 V.I. at 335-36 ("Appellate courts generally refuse to consider issues that are raised for the first time on appeal. . . . Furthermore, on appeal to this Court, the scope of our review is restricted to those questions that were properly preserved for review in the trial court and further raised on appeal according to the rules of this Court."). Here, no exceptional circumstances exist, and therefore these arguments are waived.