**Vicki WESTCOTT, Administratrix, Plaintiff–Appellant,**

v.

**Joseph C. CRINKLAW, Defendant–Appellee,**

**City of Omaha, A Municipal Corporation, Defendant.**

No. 94–2543.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 16, 1994.

Decided Oct. 13, 1995.

Rehearing and Rehearing En Banc Denied Nov. 29, 1995.

Ronald H. Stave, Omaha, NE, argued (John F. Thomas and Matthew McGrory, Omaha, NE, on the brief), for appellant.

Thomas O. Memgaard, Omaha, NE, argued, for appellee.

Before McMILLIAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Vicki Westcott appeals from the district court's entry of judgment in favor of Joseph C. Crinklaw following a jury trial. Westcott brought suit under 42 U.S.C. § 1983 (1988) and 42 U.S.C. § 1988 (Supp. V 1993), alleging that Crinklaw, an Omaha, Nebraska police officer, used excessive and unreasonable force when he shot and killed her husband, Arden Westcott. Following an eight day trial, the jury returned a verdict in Crinklaw's favor. We reverse the judgment of the district court and remand for a new trial.

Crinklaw testified that, on the morning of October 29, 1986, at approximately 3:30 a.m., he received a radio dispatch informing him that an intrusion alarm had sounded at the Keystone Pharmacy. When Crinklaw arrived at the pharmacy, he saw Westcott crouched near the building's rear door apparently attempting to break into the building. Upon seeing Crinklaw, Westcott ran toward the far east corner of the building and then back toward the west end of the building. As Westcott reversed course, Crinklaw saw something reflect in Westcott's hands. Crinklaw then got out of his car, chased Westcott, and yelled for him to stop. As the chase continued, Westcott turned his upper torso and began to bring his hand back towards Crinklaw. Crinklaw testified that, at that point, he believed Westcott had a gun, and that Westcott would shoot him in his attempt to get away. Crinklaw fired two shots, one of which killed Westcott. Crinklaw immediately went to Westcott's body and

found no gun. Westcott was carrying only two screwdrivers and a hammer.

On appeal, Westcott argues that the district court committed reversible error in: (1) allowing Crinklaw's expert to testify that Crinklaw suffered from post-traumatic stress syndrome following the shooting, causing Crinklaw to make inaccurate statements; (2) excluding evidence about Crinklaw's suspension for shooting Westcott and a previous suspension following another shooting incident; (3) not requiring the City to produce the police department's internal investigation file concerning the shooting; (4) allowing Crinklaw's counsel to read portions of Crinklaw's criminal trial[1] deposition at trial; (5) permitting Crinklaw to introduce evidence that the shooting was justified; and (6) refusing to give one of Westcott's proposed jury instructions. Additionally, Westcott contends that the district court abused its discretion in requiring her to pay part of an expert's deposition fee, for a deposition taken by Crinklaw.

## I.

After the shooting, police officers questioned Crinklaw about the shooting. When asked whether "the subject turned in his direction," Crinklaw replied: "If you're asking me whether or not he turned in a menacing manner, no." Crinklaw also admitted that he "didn't know" if he was "in fear," and that he "did not know" if Westcott had a gun in his hand.

At trial, Dr. Steven Sherrets testified that Crinklaw suffered from post-traumatic stress syndrome after the shooting, and that post-traumatic stress syndrome may cause a person to make inaccurate, unreliable and incomplete statements. Westcott contends that Sherrets' testimony impermissibly invaded the province of the jury.

■ Decisions concerning the admission of expert testimony lie "within the discretion of the trial court and will not be reversed absent an abuse of discretion." *United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986).

---

1. As a result of the shooting, Crinklaw was tried   for manslaughter and found not guilty.

■ Federal Rule of Evidence 702 permits expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." However, " '[a]n expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility.' " *Azure,* 801 F.2d at 340 (quoting *United States v. Samara,* 643 F.2d 701, 705 (10th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981)). Nor may an expert pass judgment on a witness' truthfulness in the guise of a professional opinion. *United States v. Whitted,* 11 F.3d 782, 785–86 (8th Cir.1993).

The following are excerpts from Dr. Sherrets' testimony:

Q. Just focus upon the physiological, emotional and psychological reactions that the officer has afterwards in dealing with [a situation such as a shooting]?

A. Usually the heart is racing, adrenaline's flowing. Many officers report a numbness, an unrealness, difficulty making sense, an immediate attempt to try to reconstruct the events that have happened. Oftentimes incomplete, inaccurate or in some cases even total memory lapses of what's occurred.

Q. Is there a name applied in the psychological profession for this reaction that you're talking about?

A. Posttraumatic stress.

Q. Could you focus on how posttraumatic stress and these symptoms that you have listed would affect the police officer's ability to write reports and give oral accounts of what had happened.

. . .

A. Officers in this type of situation very frequently, in fact as a standard rule, give varying accounts . . . basically the ability to accurately report immediately following a situation's [sic] seriously impaired.

Q. Was Joseph Crinklaw exhibiting the symptoms of posttraumatic stress syndrome?

A. Yes, he was.

In *Azure,* we concluded that the district court's admission of a pediatrician's testimony that an alleged victim of childhood sexual abuse "was believable and that he could 'see no reason why she would not be telling the truth in this matter . . .' " constituted reversible error. 801 F.2d at 339. We reasoned that, although some expert testimony may be helpful in child sexual abuse cases, "putting an impressively qualified expert's stamp of truthfulness on a witness' story goes too far." *Id.* at 340.

■ Westcott relied on Crinklaw's statements immediately after the shooting to try and establish that Crinklaw was not in fear for his life when he shot her husband. Dr. Sherrets' testimony that Crinklaw suffered from post-traumatic stress syndrome following the shooting, and that post-traumatic stress seriously impairs an officer's ability to describe an incident, and often causes "incomplete, inaccurate or in some cases even total memory lapses," provided an explanation for Crinklaw's statements immediately after the shooting. Dr. Sherrets' testimony thus was directed to the reliability of Crinklaw's statements. The reliability of Crinklaw's statements, however, was a credibility issue which should have been left in the exclusive province of the jury. *See Whitted,* 11 F.3d at 786–87 (reversing jury verdict because expert's testimony invaded the jury's exclusive province to decide witness credibility); *Azure,* 801 F.2d at 341. Dr. Sherrets' testimony impermissibly bolstered Crinklaw's credibility by providing a psychological explanation for Crinklaw's varying accounts of the shooting. As a result of Dr. Sherrets' testimony, "[t]he jury may well have relied on his opinion and 'surrender[ed] their own common sense in weighing testimony . . . .' " *Id.* (quoting *United States v. Barnard,* 490 F.2d 907 (9th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974)). The district court abused its discretion in permitting Dr. Sherrets' testimony.

Crinklaw argues that *United States v. Johns,* 15 F.3d 740 (8th Cir.1994), supports the district court's admission of Dr. Sherrets' testimony. In *Johns,* the defendant challenged his convictions of sexual abuse arguing, among other things, that the district court erred in admitting expert testimony. *Id.* at 743. We concluded that "[a] qualified

expert may inform the jury of characteristics of sexually abused children and describe the characteristics exhibited by the alleged victim but may not state an opinion that sexual abuse has in fact occurred." *Id.* Dr. Sherrets' testimony did more than describe characteristics of post-traumatic stress syndrome or its manifestations. Dr. Sherrets testified that Crinklaw was suffering from post-traumatic stress syndrome following the shooting, and that this syndrome oftentimes resulted in an officer making incomplete, inaccurate, and misleading statements. This testimony directly addressed the credibility of Crinklaw.

The issue is close and not fully covered by the cases we have considered. *Azure* and *Whitted* both involved doctors' opinions concerning whether a victim had been sexually abused. The doctor in *Azure* explicitly vouched for the credibility of the young victim's testimony. 801 F.2d at 341. *Whitted* involved a somewhat more indirect opinion, and we held that the doctors' diagnosis of sexual abuse was "only a thinly veiled way of stating that [the victim] was telling the truth." 11 F.3d at 787. Nevertheless, in both cases we held the testimony to be improperly admitted because of the testimony's impact on the issue of credibility.

Certainly the testimony before us is a small step beyond *Azure* and *Whitted.*[2] The testimony before us, however, is the same type, as it provides a psychological label or diagnosis as a way of excusing or justifying Crinklaw's statements made immediately after the shooting. The accuracy of these statements is a pure question of credibility. *Azure* and *Whitted* plainly stand for the proposition that expert testimony going to the issue of credibility is not admissible.

"An error, in order to be reversible, must affect a substantial right of the objecting party." *Crane v. Crest Tankers, Inc.,* 47 F.3d 292, 296 (8th Cir.1995). The accuracy of Crinklaw's statements immediately following the shooting was the issue upon which the case turned, and absent Dr. Sherrets' improper bolstering of Crinklaw's testimony, the jury might not have reached the same verdict. Therefore, Westcott was prejudiced by the error. We reverse the district court's judgment and remand to the district court for a new trial.

## II.

Westcott also argues that the trial court committed reversible error in not allowing her to introduce evidence of Crinklaw's 1986 suspension for the Westcott shooting and a 1976 suspension for another shooting incident. During trial, Crinklaw testified that he had not fired his gun at a person in the line of duty from 1968 to 1986. He also testified that he had served as a member of the Omaha police force continuously and uninterrupted for 28 years. Westcott then attempted to introduce evidence that Crinklaw had been suspended from the Omaha police force as a result of the Westcott shooting and a 1976 shooting incident. The judge excluded evidence on the grounds of relevancy and unfair prejudice. *See* Fed.R.Evid. 403.

■ "A trial judge has wide discretion in ruling on the admissibility of evidence, and his decisions will not be disturbed unless there is a clear and prejudicial abuse of discretion." *Maddox v. Patterson,* 905 F.2d 1178, 1179 (8th Cir.1990). "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Fed.R.Evid. 403. "Exclusion under Fed.R.Evid. 403 is an extraordi-

---

2. Our conclusion that the district court abused its discretion in allowing Dr. Sherrets to testify that Crinklaw suffered from post-traumatic stress syndrome, and persons suffering from post-traumatic stress syndrome often make inaccurate, misleading, and incomplete statements is also consistent with several decisions of this court. We have upheld the trial court's exclusion of psychiatric testimony about a defendant's intent because such testimony is unnecessary to assist the jury under Rule 702. *See, e.g., United States v. Barta,* 888 F.2d 1220, 1223 (8th Cir.1989)

(upholding trial court's exclusion about expert testimony that defendant suffered from detail phobia); *United States v. Felak,* 831 F.2d 794, 797 (8th Cir.1987) (upholding trial court's exclusion of psychiatric testimony of a defendant's obsessive belief in voluntary income tax payments); *United States v. Ellsworth,* 738 F.2d 333, 336 (8th Cir.) (upholding trial court's exclusion of psychiatric testimony about a defendant's good faith belief in the voluntariness of income taxes), *cert. denied,* 469 U.S. 1042, 105 S.Ct. 528, 83 L.Ed.2d 415 (1984).

nary remedy and should be used sparingly."
*Hogan v. American Tel. & Tel. Co.,* 812 F.2d
409, 411 n. 2 (8th Cir.1987) (per curiam).

■ The district judge's exclusion of evidence regarding the 1986 and 1976 suspensions was an abuse of discretion. Crinklaw made an issue of his employment record and the number of times he had fired his weapon in the line of duty by his testimony, thus opening the door for the admission of evidence regarding the 1986 and 1976 suspensions. In excluding the evidence of the 1986 and 1976 suspensions, the district judge permitted Crinklaw's testimony to go before the jury uncontested.

*United States v. Reece,* 614 F.2d 1259 (10th Cir.1980), is instructive. In *Reece,* the government agreed not to introduce evidence about a business transaction which defense counsel argued would be prejudicial. *Id.* at 1262. However, defense counsel brought up the transaction in his opening statement and painted a verbal picture indicating employee loyalty on the part of the defendants. The district court then permitted the government to introduce evidence relating to the transaction. The Tenth Circuit concluded that, under such circumstances, the trial court did not abuse its discretion in allowing the government to introduce the evidence, even though it was contrary to the government's pre-trial agreement, because the defense opened the door in its opening statement. *Id.*

In this case, Crinklaw testified about his twenty-eight years of continuous service and the number of times he fired his weapon in the line of duty. Thereafter, the district court refused to allow Westcott to introduce evidence demonstrating that Crinklaw's service was not continuous because of the suspensions, and that Crinklaw had fired his weapon on more occasions than he testified about, thus demonstrating the arguable falsity of Crinklaw's testimony. The result was that Crinklaw's testimony went unrefuted before the jury.

Crinklaw argues that his testimony regarding the continuity of his employment, and the number of times he had previously discharged his firearm was collateral and, therefore, the district court was within its discretion in excluding the evidence. *See United States v. Gibson,* 568 F.2d 111, 112 (8th Cir.1978) (per curiam) (holding that excluding evidence on collateral matters is within the trial court's discretion). Crinklaw's testimony, however, gave the jury a favorable impression of Crinklaw's career as an Omaha police officer. Crinklaw's record as a police officer was not a collateral issue. Moreover, the excluded evidence was relevant to Crinklaw's credibility, a key issue at trial.

Crinklaw also argues that his testimony did not amount to a denial of the prior suspensions or the 1976 shooting incident. The record leads us to conclude otherwise. On direct examination, Crinklaw's counsel asked: "[I]s it your testimony that from 1968 until 1986, you did not once fire your weapon in the line of duty at a person?" and Crinklaw answered, "Well, the two times." Crinklaw's answer was clearly an assertion that he had not fired his gun at a person in the line of duty in 1976. On cross-examination, Westcott's counsel asked Crinklaw if his twenty-eight years of service on the police force were "continuous, uninterrupted" and Crinklaw answered affirmatively. Although Crinklaw's answer was not an outright denial of the 1986 and 1976 suspensions, the jury could have easily concluded that he was denying that he had ever been suspended.

Thus, we conclude that the district court abused its discretion in excluding the evidence of the 1986 and 1976 suspensions.

### III.

We discuss the remaining issues Westcott raises on appeal because of the likelihood that they will arise on retrial.

Westcott contends that the district court erred in refusing to compel the City of Omaha to produce the police department's internal investigation file about the shooting. Magistrate Judge Richard C. Peck denied Westcott's motion to compel production of the file, concluding that governmental privilege applied. The magistrate judge reasoned that the public interest in maintaining the confidentiality of the statements made by Crinklaw during the internal investigation

outweighed the prejudice to Westcott from not having access to the records. *See* Neb. Rev.Stat. § 27–509(1) (1989).

■ The magistrate judge pointed out that Westcott had access to a transcript of Crinklaw's criminal trial, copies of the official police reports concerning the incident, and a copy of Crinklaw's statement given to homicide investigators several days before the Internal Investigations Unit interview. The magistrate judge concluded that any harm to Westcott as a result of withholding the file was minimal. However, Westcott contends that since the magistrate judge entered his order denying production, she has discovered an additional reason for believing that the internal investigation file is significant. Thus, on remand we believe it appropriate for the district court to inspect the internal investigation file *in camera,* and reconsider Westcott's motion to compel production in light of the concerns now expressed by Westcott. *See, e.g., Wood v. Breier,* 54 F.R.D. 7, 9–10 (E.D.Wis.1972).

### IV.

Westcott contends that the district court committed reversible error in allowing Crinklaw's counsel to read portions of Crinklaw's criminal trial deposition at trial. Westcott asserts that before trial, the district court stated that Crinklaw's counsel would not be permitted to read any portions of Crinklaw's deposition testimony to the jury. However, at trial, after Westcott's counsel read portions of Crinklaw's deposition testimony, the district court, for the purpose of completeness, permitted Crinklaw's counsel to read portions of Crinklaw's deposition testimony. *See* Fed.R.Evid. 106. Westcott then unsuccessfully moved for a mistrial. Westcott contends that she was prejudiced in several respects by what she views as "the district court's reversal of itself."

Westcott's belief that the district court reversed itself in permitting Crinklaw to read in portions of his criminal trial deposition testimony, stems from comments which the district judge made on May 4, 1994, during pretrial proceedings. In rejecting Westcott's motion for a mistrial, the district judge stated: "To say that I, on May 4, precluded or

otherwise restricted use of testimony from Officer Crinklaw's manslaughter trial is incorrect and . . . is just simply incorrect and a mischaracterization of the proceedings." Thus, it appears that Westcott misunderstood the district court's ruling. Because we are reversing the district court's judgment on other grounds, and such a misunderstanding can easily be avoided when the case is retried, we need not decide if the district court should not have allowed the deposition testimony.

### V.

Westcott argues that the district court should have excluded evidence that the shooting was justified because the issue was conclusively determined against Crinklaw in a prior administrative proceeding.

Following the shooting, a hearing was held before Ola M. Anderson, Personnel Director for the City of Omaha. The purpose of the hearing was to determine whether Crinklaw should be terminated for "committing acts or omissions unbecoming a police officer." On February 10, 1987, Anderson entered her finding that Crinklaw, as a result of his actions in connection with the shooting, violated the Omaha Police Union's contract with the City by committing acts or omissions unbecoming of a police officer, and that a manslaughter charge then pending against Crinklaw reflected discredit upon Crinklaw's service as a police officer. Crinklaw was suspended without pay for fifteen days, and was to be terminated once the suspension ended. Crinklaw appealed the decision. After the jury in Crinklaw's manslaughter trial returned a verdict of not guilty, Crinklaw's discipline was modified to include only a fifteen-day suspension. Once Crinklaw's discipline was modified, Crinklaw withdrew his appeal. The modification of Crinklaw's discipline had no effect on Anderson's findings.

The Supreme Court has held: "[W]hen a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled

in the State's courts." *University of Tenn. v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 3226, 92 L.Ed.2d 635 (1986) (citation omitted).

The Nebraska Supreme Court has held that in order for issue preclusion to apply, four requirements must be established:

(1) The issue concluded must be identical.

(2) The issue must have been raised and litigated in the prior action.

(3) The issue must have been material and relevant to the disposition of the prior action, and

(4) The determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*JED Constr. Co. v. Lilly,* 208 Neb. 607, 305 N.W.2d 1, 3 (1981) (quoting *Schneberger v. United States Fidelity & Guar. Co.,* 213 N.W.2d 913, 917 (Iowa 1973)).

██ We need to consider only the first factor of the *JED Construction* test in order to conclude that issue preclusion does not apply. Anderson's determination that Crinklaw committed acts or omissions which were unbecoming of a police officer and which reflected discredit upon the Omaha Police Division simply is not "identical" to a finding that Crinklaw's use of deadly force was unreasonable. Thus, issue preclusion does not apply, and the district court did not err in allowing Crinklaw to introduce evidence that the shooting was justified.

## VI.

██ Westcott contends the district court abused its discretion in refusing to instruct the jury that Crinklaw's trial testimony that he believed his life was threatened was inconsistent with his earlier statements, and should be discredited as a matter of law. " 'Where a party without reasonable explanation testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of pending litigation, such evidence is discredited as a matter of law and should be disregarded.' " *Momsen v. Nebraska Methodist Hosp.,* 210 Neb. 45, 313 N.W.2d 208, 213 (1981) (quoting *Insurance Co. of N. Am. v. Omaha Paper Stock, Inc.,* 189 Neb. 232, 202 N.W.2d 188,

190 (1972)). In his trial testimony, Crinklaw offered explanations for his incomplete responses immediately following the shooting. Whether his explanations were satisfactory was a question for the jury to decide. Thus, the district court did not err in refusing to give Westcott's proposed jury instruction.

## VII.

██ Finally, we uphold the district court's order requiring Westcott to pay part of an expert's deposition fee for a deposition taken by Crinklaw. The district court's order was based on equitable considerations unique to this case and did not constitute an abuse of discretion.

For the foregoing reasons, we reverse the district court's judgment and remand to the district court for a new trial.

WOLLMAN, Circuit Judge, concurring and dissenting.

With all due respect to the court's opinion, I believe that my colleagues have extended the holding in *Azure* and *Whitted* beyond the rationale of those cases.

It is important to consider the context in which Dr. Sherrets expressed his opinion regarding Crinklaw's post-shooting emotional state. As quoted in the court's opinion, Dr. Sherrets answered "Yes, he was," in response to counsel's question, "Was Joseph Crinklaw exhibiting the symptoms of post-traumatic stress syndrome?" Prior to that question and answer, Dr. Sherrets had described Crinklaw's physical appearance at the time Dr. Sherrets met with him the morning of the shooting: "He was very distraught, very nervous, as I recall, I believe his asthma was bothering him somewhat. He was clearly emotionally upset, still very concerned, physically and emotionally upset." This testimony was consistent with that of several of Crinklaw's fellow officers, who testified that Crinklaw was "very pale and noticeably shaky," that he was "[v]ery quiet, very soft-spoken, subdued, upset ... visibly shaken," and that he looked "shocked ... just dazed."

Dr. Sherrets concluded from the symptoms manifested by Crinklaw that Crinklaw was experiencing posttraumatic stress. During cross-examination, Dr. Sherrets testified that "[a]ll I can tell you is that the accuracy of statements following these types of situations oftentimes have errors and inaccuracies in them." Most telling, later during cross-examination the following exchange took place:

Q. You can't tell us the facts on the report are accurate or not. True?

A. True.

Q. You can't tell us what he told you afterwards is accurate. True?

A. There certainly are things that we do to establish the credibility of what one says or consistencies in one's statements with what other people are told. And in determining the factualness that is your process, there are things that I was aware of or I was told that may add to or detract from that.

But the finding of truth or not truth strikes me as the legal arena and I'm a psychologist to describe what's going on psychologically. I can offer what I was told, what I saw. *Beyond that it's up to you all.* (Emphasis added.)

As I read Dr. Sherrets' testimony, then, it consisted of his description of posttraumatic stress syndrome, the effect of that syndrome on the accuracy of the victim's post-event recollection and description of the events that triggered the syndrome, and his conclusion that Crinklaw's demeanor and behavior indicated that Crinklaw was experiencing posttraumatic stress. Dr. Sherrets disclaimed any intention to offer any opinion as to the truth of the various post-shooting accounts given by Crinklaw, stating, quite accurately, that "it's up to you all." And indeed it was for the jury to determine which of Crinklaw's accounts represented the true picture of what he was faced with that early morning of October 29, 1986.

We said in *Whitted*, "[A] qualified expert can inform the jury of characteristics in sexually abused children and describe the characteristics the alleged victim exhibits." 11 F.3d at 782. True, the expert may not express an opinion that sexual abuse has occurred or pass judgment on the alleged vic-

tim's truthfulness. *Id.* at 785–86. In my opinion, Dr. Sherrets' testimony violated neither of those proscriptions. It was for the jury, and for the jury alone, as emphasized by Dr. Sherrets himself, to determine where the truth lay with respect to Crinklaw's statements, and Dr. Sherrets' testimony did not invade the jury's prerogative to do so, as implicitly found by the district court when it overruled the objection that raised that particular ground. Rather, what we said about the expert witness in *United States v. Johns* is equally applicable in the present case: "Dr. [Sherrets'] testimony was circumscribed so as to educate rather than to usurp the role of the jury...." 15 F.3d 740, 743 (8th Cir. 1994). That Dr. Sherrets' testimony provided a psychological explanation for Crinklaw's varying accounts of the shooting, an explanation the validity of which I do not understand to be challenged, rendered that testimony no more inadmissible than the psychologist's testimony in *Johns*. Finally, we must remember that the present case involves a civil action and not a criminal prosecution.

With respect to the district court's other rulings that the court finds wanting, suffice it to say that I find none of them to represent an abuse of discretion. It should be noted that Crinklaw's testimony regarding the continuous nature of his service on the Omaha police force came in, as the court notes, during cross-examination, when, in answer to the question, "Are you trying to give us the impression that that has been a continuous, uninterrupted time on the police force?", Crinklaw answered, "Basically, yes." Although the court says that this equivocal answer could be construed by the jury as a denial by Crinklaw that he had ever been suspended, it can just as plausibly be interpreted as a forthright answer to a question designed to set Crinklaw up for attack on a collateral issue. I would defer to the district court's on-the-scene ruling made with the advantage of an appreciation of the nuances that do not readily find expression in the cold pages of the record.

I concur in Parts IV, V, VI, and VII of the court's opinion.

This was a hard-fought trial, fraught with the emotions necessarily attendant upon a wrongful death action. We will never know what prompted Arden Westcott to burglarize the Keystone Pharmacy that October morning, an act that from all accounts was totally out of keeping with the way in which he had lived his life as a husband, father, and hard-working, law-abiding citizen up until that moment. I would not compound the tragic circumstances of Arden Westcott's death by requiring Officer Crinklaw to run the gauntlet of yet another trial. Accordingly, I would affirm the judgment.