**ROSA MARIA PERALTA RODRIGUEZ, Appellant/Plaintiff**

**v.**

**CARMELO RODRIGUEZ-RAMOS, Appellee/Defendant**

S. Ct. Civil No. 2014-0012

Supreme Court of the Virgin Islands

March 16, 2016

EMILE A. HENDERSON, III, ESQ., The Law Offices of Yvette D. Ross-Edwards, St. Croix, USVI, *Attorney for Appellant.*

EUGENIO W. A. GÉIGEL-SIMOUNET, ESQ., Law Offices of Wilfredo A. Géigel, St. Croix, USVI, *Attorney for Appellee.*

HODGE, Chief Justice; CABRET, Associate Justice; and SWAN, Associate Justice.

## OPINION OF THE COURT

(March 16, 2016)

SWAN, *Associate Justice.* Appellant, Rosa Maria Peralta Rodriguez ("Peralta"), appeals the Superior Court's February 14, 2014 order, which awarded her $12,699.31 as her one-half share of the proceeds of the sale of the marital home she shared with her husband for sixteen years, before their divorce. For the following reasons, we vacate the February 14, 2014 order and remand this case to the Superior Court for further factual findings on the appropriate distribution of the proceeds of the sale of the marital home, factual findings on each party's fault with regards to the deterioration of the property, and factual findings on their effect on the apportionment of the sale proceeds to each party.

## I. FACTS AND PROCEDURAL HISTORY

Peralta and Carmelo Rodriguez-Ramos ("Rodriguez") married in 1990. (JA at 4.) From 1993, the parties resided at their marital home, which was located at Number 642 Estate Sunny Acres, St. Croix. (JA at 15.) Rodriguez was the sole homeowner of record and made the monthly mortgage payments. The couple divorced in 2009. At the time of the divorce, the marital home was still subject to a mortgage, but the payments were not current. (JA at 15.) By a term of the April 14, 2009 divorce decree, Rodriguez was ordered to continue paying the mortgage, insurance, taxes, utilities, and maintenance costs associated with the marital home. (JA at 16.) Additionally, Peralta and Rodriguez were each awarded a fifty percent interest in the marital home. (JA at 16.)

This case subsequently came before the Superior Court on a show cause hearing on January 18, 2010, pursuant to which the court, in its January 26, 2010 ruling, ordered the parties to have the marital home appraised. (JA at 20.) The ruling prohibited both parties from

"damag[ing], chang[ing], or alter[ing] [the premises] in any way which would reduce its market value." (JA at 19.) The court further afforded Rodriguez the option to purchase Peralta's one-half interest in the marital home, failing which the home would be listed for sale. (JA at 20.) The court also ordered that upon the final sale of the property, each party would be entitled to one-half of the proceeds thereof, after all expenses and fees were paid and the outstanding mortgage was fully satisfied. (JA at 20.)

The marital home was appraised by a certified appraiser on March 2, 2010, at a value of $150,000. (JA at 28.) The appraiser found the home to be in fair to average condition, with no deficiencies or adverse conditions affecting its livability, soundness or structural integrity. (JA at 23.) Thereafter, Rodriguez placed the home on the market for sale. Six months after the appraisal, Rodriguez sought and received estimates for home repairs on the property, from two construction contractors, D.S. Painting and Etienne Construction. These estimates were $24,000 and $36,824, respectively. (JA at 190-92.) Rodriguez, a civil engineer by profession, with extensive experience in construction, also inspected the home and arrived at his repair estimate of $57,000. (JA at 194.) Rodriguez then obtained a payoff quote from his lending bank of $44,601.39 on the outstanding mortgage. This quote included an unpaid late charge of $106.78, interest in the amount of $991.10, and "additional contractual and other fees and charges" in the amount of $255. (JA at 146-47.) On dates unknown, foreclosure proceedings had commenced on the home, before Rodriguez became current on the mortgage payments. (JA at 270.)

In 2012, Rodriguez secured a potential buyer, Oneida del Carmen Guzman ("Guzman"), but he did not seek a new appraisal for the home. Guzman inspected the property around August 2012. After negotiations, Guzman and Rodriguez agreed on a purchase price of $95,000, with a home repair credit of $25,000, for a final sale price of $70,000. (JA at 205-07.) Rodriguez offered the $25,000 credit after considering the two construction contractors' home repair estimates he had received in 2010, with the objective of offering a "round number" between the $24,000 and the $36,824. According to Guzman, the only necessary repairs were to the roof, the walls and the electrical sockets. (JA at 107.) Of these, Rodriguez had only sealed holes in the galvanized portion of the roof, despite his knowledge that the corrosion in the roof was worsening beneath the sealant. (JA at 197, 261, 288.)

Upon the sale of the home around September 2012, the mortgage payoff of $44,601.39 was satisfied with a portion of the sale proceeds, leaving a remainder of $25,398.61. By motion dated November 1, 2012, Rodriguez requested the Superior Court's permission to deposit $12,699.30[1] into the Superior Court registry, as representative of Peralta's one-half share of the sale proceeds. (JA at 61.) The court granted the motion and subsequently heard the matter on May 7, May 8 and October 4, 2013, to properly ascertain Peralta's share in the sale proceeds. During the hearing, the Superior Court found that Rodriguez was qualified to testify as an expert witness. Accordingly, he opined that both contractors' estimates were too low; therefore, he offered testimony regarding his home repair estimate of $57,000.

By order dated February 11, 2014, and subsequently entered on February 14, 2014, the Superior Court determined that Peralta's share of the sale proceeds was appropriately reduced by both the $44,601.39 mortgage payoff and the $25,000 home repair credit that Rodriguez had given Guzman. Peralta's timely appeal ensued.

## II. JURISDICTION

Title 4, section 32(a) of the Virgin Islands Code states that "[t]he Supreme Court shall have jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." A final order is a judgment which ends the litigation on the merits, leaving nothing else for the court to do except execute the judgment. *Ramirez v. People*, 56 V.I. 409, 416 (V.I. 2012) (citing *In re Truong*, 513 F.3d 91, 94 (3d Cir. 2008); *Rojas v. Two/Morrow Ideas Enters., Inc.*, 53 V.I. 684, 691 (V.I. 2010)). The Superior Court's February 14, 2014 order was a final order, disposing of all outstanding motions in this matter, and Peralta's notice of appeal was timely filed on March 4, 2014. Therefore, we have jurisdiction over this appeal.

## III. STANDARD OF REVIEW

The standard of review in examining the Superior Court's application of law is plenary, while the trial court's findings of fact are reviewed for

[1] In its February 14, 2014 order, the court determined that Peralta's one-half share of the proceeds of the sale of the marital home was $12,699.31, rather than the $12,699.30 which Rodriguez had requested to deposit into the Superior Court registry.

clear error. *Martin v. Martin*, 58 V.I. 620, 624-25 (V.I. 2013) (citations omitted). The Superior Court's distribution of marital assets in an action for divorce is reviewed for abuse of discretion. *Id.* at 625 (citing *Harvey v. Christopher*, 55 V.I. 565, 572 (V.I. 2011)). Likewise, the admission of expert testimony lies within the discretion of the trial court, and its judgment must not be reversed absent an abuse of discretion. *Alexander v. People*, 60 V.I. 486, 494 (V.I. 2014) (citing *Westcott v. Crinklaw*, 68 F.3d 1073, 1075 (8th Cir. 1995)).

## IV. DISCUSSION

### A. The Mortgage Payoff.

Peralta does not dispute that the outstanding mortgage debt on the marital home must be deducted from the sale proceeds before she is allocated her fifty percent share.[2] Rather, she argues that the court made no finding as to what portion of the $44,601.39 quoted payoff amount of the mortgage was incurred because of Rodriguez's failure to make timely mortgage payments. (Appellant's Br. at 9.) Peralta contends that Rodriguez must absorb any such amount, because the Superior Court had previously made Rodriguez responsible for the mortgage payments. (Appellant's Br. at 10.)

■ We note, preliminarily, that the Superior Court has jurisdiction to dispose of the marital homestead of the parties to a divorce action, in accordance with the equities of the case. *See* 33 V.I.C. § 2305(d). While the Virgin Islands Code does not explicitly define a "marital homestead," we have interpreted this term to mean "any 'homestead' in which a husband and wife both reside during the marriage and that is owned by one or both of the spouses." *Harvey*, 55 V.I. at 573 (citations omitted). Further, we are mindful that after the 2009 divorce decree, the Virgin Islands Legislature enacted 16 V.I.C. § 109(a)(7) on December 19, 2014, pursuant to Act No. 7702, § 1 (V.I. Reg. Sess. 2014), which provides that the court may decree:

> (7) for the award to the parties of all marital property, in accordance with principles of equitable distribution. For purposes of this para-

---

[2] When this case was before the Superior Court, Peralta's position was that her share of the proceeds should not be reduced at all by the mortgage payoff amount. (JA at 166.)

graph, *"marital property" means all real and personal property acquired by either spouse subsequent to the marriage*, except:

(A) Property acquired by gift, bequest, devise, or descent;

(B) Property acquired in exchange for property acquired prior to the marriage, or in exchange for property acquired by gift, bequest, devise, or descent;

(C) Property acquired by a spouse after a decree of legal separation;

(D) Any judgment or property obtained by judgment awarded to a spouse from the other spouse;

(E) Property excluded by valid, written agreement of the parties; and

(F) Income from property acquired by a method listed in subparagraphs (A) through (E), if the income is not attributable to the personal effort of a spouse.

(Emphasis added).

In accordance with these principles, the Superior Court granted the parties' divorce in 2009 and ordered that Peralta and Rodriguez each be awarded a fifty percent interest in the marital home. (JA at 16.) The court further ordered Rodriguez to continue to pay the mortgage, insurance, taxes, utilities, and maintenance costs associated with the marital home. (JA at 16.) Subsequently, on January 26, 2010, the court ordered that if Rodriguez could not purchase Peralta's equitable interest, and the property had to be sold, each party would be entitled to one-half of the proceeds of the sale, after all expenses and fees were paid and the outstanding mortgage was fully satisfied. (JA at 20.)

Thus, it is evident that the Superior Court's April 14, 2009 order made Rodriguez solely responsible for the mortgage payments on the marital home. However, by Rodriguez's admission, he became delinquent in his payments. When the parties divorced in 2009, he informed the court that the mortgage payments were not current. (JA at 15.) Further, at the May 8, 2013 Superior Court hearing, Rodriguez testified that the home had been in jeopardy of being foreclosed, but that he had brought his payments current on two occasions. (JA at 270.)

█ Being mindful that Rodriguez was charged with the sole responsibility of making the mortgage payments, the only plausible

conclusion is that any arrearages or penalties or charges incurred from Rodriguez's failure to make such payments on time should not apply to Peralta's fifty percent share of the sale proceeds. At the May 7, 2013 hearing, the court correctly observed from the bench, "I think it's safe to say at this point that any portion . . . that represents any arrearage[,] that [Rodriguez] will have to absorb, I think that's fair to say at this point." (JA at 181.) However, the court expected the parties to consummate an agreement on what portion of the $44,601.39 payoff would not be attributable to Peralta's share. (JA at 181.) Absent such an agreement by the parties, the court should have appropriately considered the record before it in order to determine the correct allocation of proceeds to be distributed to Peralta and Rodriguez.

Rodriguez essentially argues that Peralta provided no evidence to the Superior Court that any amount of the $44,601.39 quote constituted arrearage, or that Rodriguez had incurred any "previous outstanding balance." (Appellee's Br. at 9.) We also note that contrary to Peralta's argument, Rodriguez never conceded that arrears were included in the final payoff amount.[3] But even assuming that Rodriguez's mortgage payments were current at the time he requested the payoff quote from the bank, the court still made an incorrect finding that Peralta's share was correctly reduced by $44,601.39. First, it is undisputed that this payoff amount included a $106.78 late payment charge, which should not have been applied against Peralta's share of the proceeds. (JA at 146). Second, the quote included $991.10 in interest, and there is no indication in the record regarding whether this amount consisted of previously accrued interest which Rodriguez had failed to pay. Specifically, the court acknowledged, albeit fleetingly, that the $991.10 in interest "may include some back payments." (JA at 147.) But, the court made no inquiry or finding as to the accrual dates of the interest. Considering the foregoing, the Superior Court erred in finding that Peralta's share of the proceeds of the sale of the marital home was properly reduced by $44,601.39; consequently, we remand this case for further proceedings, including factual findings on this issue.

---

[3] In her brief, Peralta argues that Rodriguez "acknowledged that there were arrears on the mortgage, and that such arrears were included in the final pay-off amount which was deducted from the sale proceeds." (Appellant's Br. at 9.) The record does not evidence any such concession on Rodriguez's part. In fact, at the May 7, 2013 hearing, when the court asked Rodriguez's counsel if there was any back mortgage due, he responded, "[n]o." (JA at 145.)

## B. The $70,000 Sale Price of the Marital Home.

█ Peralta argues that there was sufficient evidence before the court to contest the equity of the marital home's final purchase price of $70,000. But, the question at this juncture of the proceedings is not whether the contractors' repair estimates offered by Rodriguez, or his own estimate, were accurate, or whether he had a proper basis for negotiating the amount of repair credit he actually afforded Guzman. Rather, the present issue is whether some or all of the $25,000 repair allowance concerns defects or needed repairs that were the result of Rodriguez's failure to properly maintain the property, as he was ordered to do in 2009. The Superior Court's conclusion that the entire $25,000 repair credit was properly deducted in computing the allocation of proceeds between the former spouses is without support in the trial record; therefore, the case must be remanded for proper findings on what portion of this repair allowance was attributable to each party's failure to fulfill his or her respective court-ordered obligations.

### 1. The Record Directly Contradicts a Conclusion that All of the $25,000 Repair Credit Given in the Sale of this Property Should be Deducted in Calculating the Equitable Shares of Each of the Parties in the Sale Proceeds.

While the court's February 14, 2014 order recognized that Rodriguez was responsible for and attempted to perform maintenance on the marital home, the court explained that normal repairs and maintenance do not necessarily preclude future repairs. (JA at 10.) However, the record directly contradicts the court's finding that the $25,000 home repair credit, in its entirety, should be applied in a manner reducing Peralta's share of the sale proceeds.

When the marital home was inspected on March 2, 2010, it was appraised at a value of $150,000. (JA at 28.) The appraiser arrived at this valuation *considering* the then-existing condition of the property, the needed repairs, and the deterioration of the home. (JA at 23-24, 26-27.) The appraiser also noted that the house was in fair to average condition, and that there were no physical deficiencies or adverse conditions that affected the livability, soundness, or structural integrity of the property. (JA at 23.)

There is an abundance of evidence suggesting that Rodriguez may have shirked his responsibility to properly maintain the home, which is what

455

seemingly prompted him to unilaterally offer Guzman a $25,000 credit for pre-existing repairs that he had either ignored or failed to adequately remedy. During cross-examination at the May 7, 2013 hearing, when asked if he had been properly maintaining the house, Rodriguez answered, "[y]es and no." (JA at 228.) He then gave conflicting testimony regarding the deterioration of the home in the period between the March 2, 2010 appraisal and the September 2012 sale. On one hand, Rodriguez testified, "I decide[d] to reach the point of $95,000 . . . because the damage that . . . the house [sustained] between 2010 and 2012 w[as] drastic." (JA at 241.) He then enumerated a litany of items and areas needing repairs, including the roof, gutters, sheetrock, bathtubs, toilets, windows and cove base on the walls of the home, as well as the fence. (JA at 259-264.) He also indicated that the home needed new paint, both on its interior and exterior. (JA at 259.) But on the other hand, when cross-examined about the time at which he first observed the need for such repairs, he answered, "I observed that all the time because I was living there." (JA at 260.)

In contrast, while Guzman testified that she performed both necessary repairs and aesthetic alterations in the home, she named only three areas that needed repairing to ensure that the home was livable. She testified as follows:

> [T]o really live inside that house . . . I had to change the walls and the whole roof. Later what I did is for me to live to my taste, but to repair it to be able to live in the house like any common person, the roof had to be changed and so did the walls. We also had to repair the sockets and electricity because they were badly installed.

(JA at 107.)

However, the only work Rodriguez did on any of these three areas was to the roof, by sealing some holes in the galvanized portion. (JA at 261.) Rodriguez's subsequent testimony casts substantial doubt on his assertion that he was properly maintaining the roof. He acknowledged, "[e]ven if I seal [a] hundred times, the conditions are going to continue, the deteriorating, because they require to be changed." (JA at 287.) In explaining the practical effect of sealing, he testified, "[w]hen I seal I keep what is there, but whether it's a hole or something that is corroded[,] I apply sealant over that with a good intention to seal that area but the

condition is below that anyway. The corroded portion is below that seal." (JA at 288.) Granted, this Court recognizes Rodriguez's position that financial constraints prevented him from doing more extensive repairs. However, Rodriguez's failure to fulfill his court-ordered duties cannot be fairly chargeable to Peralta's equitable share in the sale proceeds, especially since Rodriguez — the sole homeowner of record and mortgagor — did not seek a new appraisal for the home prior to the sale and arrived at a baseless and arbitrary selling price.

Lastly, we consider the Superior Court's commentary on the likelihood that a purported economic downturn in St. Croix and the closure of the HOVENSA refinery affected the value of the home. (JA at 10.) The court also mentioned St. Croix's tropical climate as a potential cause of the marital home's supposed rapid deterioration in value. (JA at 10.) While the Superior Court only noted these factors perfunctorily, we address them insofar as they may have impacted or contextualized the court's decision.

By relying on St. Croix's climate and the closure of the HOVENSA refinery without any evidence being introduced as to such closure or its economic effects, the Superior Court seemingly took judicial notice of those facts. This too was in error. In this jurisdiction, the Superior Court may take judicial notice of a fact if it represents general knowledge in the territory or it is capable of being readily determined accurately by relying on sources whose accuracy cannot be questioned reasonably. *Marcelle v. People*, 55 V.I. 536, 546 & n. 3 (V.I. 2011) (taking judicial notice of the Virgin Islands decades-old "practice of exposing clothing to the elements to dry" and that it "has not proven to inherently harm, damage or destroy clothing" (citing *Farrell v. People*, 54 V.I. 600, 615 (V.I. 2011)).

While judges are permitted to take judicial notice of certain catastrophic economic conditions affecting a particular geographic area, *see, e.g., Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249, 98 S. Ct. 2716, 57 L. Ed. 2d 727 (1978), the specific effects of an economic downturn on an individual's personal property certainly does not constitute " 'general knowledge that cannot reasonably be questioned or disputed.' " *Berrios-Rodriguez v. Berrios*, 58 V.I. 477, 489 (V.I. 2013) (quoting *Farrell*, 58 V.I. 615-16) ("[T]he specific efforts that other companies, trade associations, or the local government have taken [in light of catastrophic economic conditions] to assist displaced HOVENSA workers generally — let alone [a particular party] specifically — do not

constitute 'general knowledge that cannot be reasonably questioned or disputed.' ") Likewise, although the fact that the Virgin Islands has a tropical climate cannot be reasonably disputed, asserting that a tropical climate precipitated the deterioration of a specific home does not qualify as knowledge that lies beyond the realm of reasonable indisputability. *See id.* Thus, in order to rely on the effects either the HOVENSA refinery closure or the tropical climate had on the home, the Superior Court must have been presented with evidence substantiating these facts.

The record is devoid of any evidence confirming that the HOVENSA refinery closure either decreased the value of this property, or at all influenced the agreement between Guzman and Rodriguez. In fact, Guzman and Rodriguez were in agreement that the need for *repairs* decreased the value of the home, differing only in which repairs each considered necessary. On cross-examination, Guzman was asked if Rodriguez had informed her of the $150,000 appraisal value of the marital home. She responded, "[y]es, he had told me at some point that the house was worth something before, but the house had devalued a lot with the [need for] repairs." (JA at 118.) And, Rodriguez indicated that the reason he offered a selling price of $95,000, which is significantly below the appraisal value, was because of the damages which supposedly occurred between 2010 and 2012, and his belief that no buyer would purchase the house "in that condition." (JA at 241.) Undeniably, there was absolutely no evidence presented to support a factual determination or even suggest that the closure of the HOVENSA refinery or an economic downturn on St. Croix affected the fair market value of the home.

Similarly, there was no evidentiary basis to conclude that St. Croix's climate caused an accelerated deterioration of the physical condition of the marital home. First, the court failed to explain how such climate, over two and a half years, reasonably justified a $25,000 home repair credit. Second, of the three necessary repairs cited by Guzman, the only maintenance Rodriguez testified to performing was to the roof, which he knew was corroded. (JA at 197, 261.) He was aware that "a lot of water" was coming through the galvanized portion of the roof and entering the home. (JA at 261.) Nonetheless, as discussed above, the court chose a makeshift solution in resolving the issue. The Superior Court erred in taking judicial notice of how the HOVENSA refinery closing affected the property's value. It was also improper for the court to take judicial notice as to what extent St. Croix's climate could cause damage to the property.

Thus, on remand, the court should not take these factors into consideration when attributing fault to each of the parties without proper evidence being submitted to the court for evaluation.[4]

## 2. Calculation of the Parties' Respective Shares of the Actual Proceeds of the Sale.

The amount which is now available for equitable distribution between Peralta and Rodriguez — the proceeds of the home sale — is a sum of $25,398.61. Thus, on remand, we direct the Superior Court to adjust the monetary value of each party's one-half share of the $25,398.61 sale proceeds, consistent with its factual findings on the issue of the parties' respective fault in causing the deterioration of the home.

Rodriguez failed to object to or appeal the determination made in the divorce proceedings in the April 14, 2009 decree that, from that point, he was to be solely responsible for maintenance of the property. Nor did he or Peralta object to or appeal the determination made in the January 26, 2010 ruling that both parties were prohibited from damaging, changing or altering the property. Therefore, it is important for the Superior Court, in the current phase of the proceedings, to first determine whether the $25,000 repair allowance actually given to Guzman at the closing of the sale transaction was a result of either party's failure to fulfill his or her respective court-ordered obligations. Depending upon whether the Superior Court can make explicit findings on the primary components of the actual damage or needed repairs that warranted the $25,000 allowance at the time of sale, the court should determine what portion of the repair allowance, if any, was not the fault of either party.

Next, in its calculation of each party's equitable share, the court would first subtract the $44,601.39 mortgage payoff from the gross sale price of $95,000, leaving a remainder of $50,398.61, an amount which would have been the sale proceeds had Rodriguez been properly maintaining the property and had Peralta not been responsible for any damage to the property. The court would then subtract from this amount the portion of the repair allowance that was *not* the fault of either party, if any. On the premise that equitably there should be a 50/50 division of what the equity

---

[4] We also observe, as did the Superior Court, that Rodriguez's position throughout the hearing was that Peralta was the cause of the property's supposed deterioration between 2010 and 2012, through an alleged failure to properly keep up the home.

should have been in the property, the Superior Court would then equally divide the remaining sale proceeds and reduce each party's distribution in accordance with the monetary value attributed to each party's failure, if any, to comply with each party's court-ordered obligations.

For example, let us assume the trial court found that the entire $25,000 repair allowance was occasioned by Rodriguez's failure to comply with his court-ordered maintenance obligations. The court would first subtract the $44,601.39 mortgage payoff from the gross sale price of $95,000, leaving a remainder of $50,398.61. On an equal sharing of equity basis, Peralta would receive 50% of $50,398.61, which would make her share approximately $25,199.31. Rodriguez's approximate $25,199.31 share would then be reduced by the entire $25,000 repair allowance, leaving him with a distribution of $199.31.

As a second example, let us assume that on remand the Superior Court were to find that Rodriguez was responsible for only $10,000 of the $25,000 repair allowance and Peralta was not responsible for any portion of the remaining allowance. Again, the court would first subtract the $44,601.39 mortgage payoff from the gross sale price of $95,000, leaving a remainder of $50,398.61. From this amount, the court would then subtract the $15,000 portion of the repair allowance which was not the fault of either party, leaving a remainder of $35,398.61 to be equitably divided between Rodriguez and Peralta. Since no fault is attributed to Peralta in this scenario, she would receive her full 50% share of $35,398.61, which is approximately $17,699.31. Rodriguez's approximate $17,699.31 share would be reduced by $10,000, leaving him with a distribution of $7,699.31.

Peralta's receipt would be reduced, however, if she were also found responsible for a portion of the $25,000 repair allowance. As a final example, let us assume that in addition to attributing $10,000 of the repair allowance to Rodriguez, the court also attributes $5,000 of the repair allowance to Peralta. The court would first subtract the $44,601.39 mortgage payoff from the gross sale price of $95,000, leaving a remainder of $50,398.61. From this amount, the court would then subtract the $10,000 portion of the repair allowance which was not the fault of either party, leaving a remainder of $40,398.61 for equitable division, 50% of which is approximately $20,199.31. Rodriguez's approximate $20,199.31 share would be reduced by $10,000, leaving him with a distribution of

$10,199.31. Similarly, Peralta's approximate $20,199.31 share would be reduced by $5,000, leaving her with a distribution of $15,199.31.[5]

Lastly, after the court calculates each party's equitable distribution as illustrated above, any portion of the mortgage payoff incurred by Rodriguez's failure to make timely mortgage payments (the $106.78 late fee, for instance) would be further deducted from Rodriguez's distribution, and that same amount would be added to Peralta's.

## C. Rodriguez's Expert Testimony.

Lastly, because the issue may well arise in the proceedings on remand, we address Peralta's contention that the court abused its discretion when it allowed Rodriguez to testify as an expert witness on his own behalf.[6] The crux of Peralta's argument is that Rodriguez failed to provide any methodology or basis as to how he arrived at his estimate and his opinion on the estimates from D.S. Painting and Etienne Construction. Peralta therefore asserts that Rodriguez's testimony, in both regards, was not reliable. Because these specific objections were not made before the Superior Court, we deem them waived on appeal.

---

[5] For illustrative purposes, the total of both parties' equitable shares in the three preceding examples is $25,398.62, rather than the actual sale proceeds of $25,398.61.

[6] It is insufficiently clear from the record whether the Superior Court qualified Rodriguez as an expert for purposes of both testifying to his own home repair estimate as well as opining on the reasonableness of the contractors' estimates he received, or only for testifying to the latter. In overruling Peralta's objection to Rodriguez's opining on the contractors' estimates, the court stated, "[y]es, this gentleman can be — will be considered by this [c]ourt as an expert given his education and experience . . . [a]nd that being the case, he's then qualified to comment on what he received in this case with regards to estimates on the property." (JA at 193.) Rodriguez then proceeded to offer his opinion on the contractors' estimates before eventually testifying as to his own estimate of $57,000, and the home inspection he conducted in arriving at said amount. Peralta did not object to Rodriguez's testimony concerning his personal estimate, and the court did not specifically qualify Rodriguez as an expert for such purpose.

The court, however, in its February 14, 2014 order, explicitly mentioned Rodriguez's $57,000 estimate in its discussion on the home repair credit being applied to Peralta's share of the sale proceeds. The court's only adverse characterization of Rodriguez's estimate was his failure to substantiate his figure with any documentation. And, that the court qualified him to opine on the contractors' estimates naturally implies that the court deemed him sufficiently qualified to produce one of his own; it is axiomatic that the same or similar education and experience would have been required of him to offer expert testimony on both. Given these factors, we conclude that the Superior Court qualified Rodriguez as an expert witness to both offer his opinion on the contractors' home repair estimates and testify to his own estimate.

First, although not disputed, it is undeniable that Rodriguez qualified as an expert under Federal Rule of Evidence 702.[7] He testified to having earned a Bachelor of Science degree in Civil Engineering, and his thirty years of experience in the construction and repair of various buildings, including homes in this territory. (JA at 182-84.) Rodriguez's counsel moved the Superior Court to formally accept Rodriguez as an expert witness, and the court so qualified Rodriguez.

When Rodriguez ultimately testified that he found both contractors' estimates too low, Peralta failed to object. (JA at 194.) Likewise, when Rodriguez later testified as to his $57,000 estimate and the home inspection he conducted in arriving at this amount, Peralta again, failed to object. (JA at 194.) Peralta only objected when Rodriguez was asked his opinion on the contractors' estimates, before Rodriguez responded. Peralta's counsel stated, "[o]bjection. Your Honor, I'm going to object. Is Mr. Rodriguez used as his own expert to give expert testimony based on two estimates for people who aren't even here?" (JA at 192.) Peralta failed to further clarify the precise nature of this seemingly two-fold objection, or elaborate on its basis. Nevertheless, Peralta's objection, as articulated, did not specify a contention that Rodriguez's testimony was inadmissible for a failure to provide the methodology he used (or was prepared to use) in reaching any conclusion on the contractors' estimates.

■ As we have previously held, in order to preserve an objection on appeal, a party must object on the specific grounds which are raised on appeal. An overly broad objection will not suffice, and neither will an objection on grounds distinct from those raised on appeal. *See V.I. Waste Mgmt. Auth. v. Bovoni Invs., LLC,* 61 V.I. 355, 370-71 (V.I. 2014)

---

[7] The Federal Rules of Evidence applied to this action pursuant to section 15(b) of Act No. 7161 (V.I. Reg. Sess. 2010) of the Virgin Islands Legislature. *See V.I. Waste Mgmt. Auth. v. Bovoni Invs., LLC,* 61 V.I. 355, 368 n.13 (V.I. 2014). FED. R. EVID. 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

(deeming the party's trial objection waived on appeal, because at trial, the party objected to the reliability of the expert witness's methods by arguing that the opinion testimony should be restricted to the witness's one-page report, while failing to argue that the testimony was inadmissible because it was based on unreliable scientific methods); *see also Yusuf v. Hamed*, 59 V.I. 841, 851 n.5 (V.I. 2013). This legal doctrine is also embodied in Virgin Islands Supreme Court Rule 4(h), which provides, "[o]nly issues and arguments fairly presented to the Superior Court may be presented for review on appeal."

██ ██ Moreover, while Peralta is correct that the court has a "gatekeeping" duty to ensure that expert witnesses' testimony satisfies Rule 702's requirements, the court "is not obliged to look into the questions posed by Rule 702 when neither side either requests or assists." *Malloy v. Reyes*, 61 V.I. 163, 183 (V.I. 2014) (citation and internal quotation marks omitted). The basis for Peralta's sole objection was essentially an inquiry to the trial judge about whether Rodriguez was being offered as an expert witness, and ostensibly, whether the court was going to so qualify him. In response, Rodriguez moved for his acceptance as an expert witness, and the court deemed Rodriguez an expert. Peralta did not raise any further issues implicated by Rule 702, let alone argue about a lack of proper methodology underlying Rodriguez's testimony. Accordingly, we deem Peralta's argument on this issue waived on appeal. V.I.S.CT.R. 4(h); *see also* V.I.S.CT.R. 22(m) ("Issues that were . . . not raised . . . before the Superior Court . . . are deemed waived for purposes of appeal.").

██ ██ Tangentially, Peralta contends that "the bulk of [Rodriguez's] testimony was based on two estimates for which there was no foundational basis for their accuracy." (Appellant's Br. at 22.) Assuming that Peralta's above-mentioned objection sufficiently preserved this issue on appeal, in its allusion to the fact that the contractors were not present at the hearing, Peralta's argument remains specious. Rodriguez's expert testimony — which he was qualified to offer — was that the contractors' estimates were *inaccurate*, i.e., unreasonable. The accuracy of the contractors' estimates was in no way foundational to Rodriguez's expert opinion on the estimated cost of the home repairs, because he had performed his own detailed inspection of the home prior to the sale and

arrived at a considerably higher estimate of $57,000.[8] We therefore conclude that the Superior Court did not abuse its discretion in allowing Rodriguez to testify as an expert witness.

## V. CONCLUSION

Although the Superior Court properly exercised its discretion in allowing Rodriguez's expert testimony, the court nevertheless abused its discretion in determining Peralta's share of the proceeds from the sale of the former marital home. The Superior Court erred in finding that the actual mortgage payoff was $44,601.39. The Superior Court also erred in applying the repair credit that Rodriguez gave to the purchaser, in a manner causing an unsubstantiated reduction in Peralta's share of the proceeds. The court failed to clearly apportion responsibility for the repair allowance between the parties, considering that the 2009 divorce decree allocated all responsibility for maintaining the former marital home to Rodriguez. Likewise, the Superior Court appears to have failed to consider the January 26, 2010 ruling, which prohibited both parties from damaging, changing and altering the former marital home in any way that would result in a reduced market value. Accordingly, this case is remanded to the Superior Court for further proceedings in compliance with this opinion.

---

[8] Even construing Peralta's argument as a challenge to the Superior Court's admission into evidence of the contractors' estimates themselves, for lack of a proper foundation, this argument is also meritless. A proper foundation only requires that the proponent produce "evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). A witness's testimony that an item is what it is claimed to be constitutes sufficient evidence. *See* FED. R. EVID. 901(b)(1). Rodriguez clearly provided this foundation. At the May 7, 2013 hearing, on direct examination, Rodriguez's counsel stated to Rodriguez, "[t]here came a time where you testified where you did some estimates for 642 Sunny Acres, I'm going to show you two estimates . . . ." (JA at 186.) When Rodriguez was shown the estimates, he testified, "[y]es. This is the two pages I submit to you." (JA at 186.)